GENERAL ELECTRIC COMPANY, Plaintiff-Appellant, *v.* THE ILLINOIS FAIR EMPLOYMENT PRACTICES COMMISSION *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 61712

Opinion filed May 18, 1976.—Rehearing denied June 29, 1976.

Vedder, Price, Kaufman & Kammholz, of Chicago (Paul F. Gleeson and Martin P. Mart, of counsel), for appellant.

William J. Scott, Attorney General, of Chicago (Stephen R. Swofford, Assistant Attorney General, of counsel), for appellees.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

This action was commenced when complainant, Ramon Rivas, filed two charges of unfair employment practices with the Fair Employment Practices Commission (hereinafter referred to as "Commission," or as "F.E.P.C." when necessary to distinguish this agency from other administrative agencies) in accordance with the Fair Employment Practices Act. (Ill. Rev. Stat. 1971, ch. 48, par. 851 *et seq.*) The respondent before that administrative agency, General Electric Company, was charged with unlawfully discriminating against complainant by terminating his employment because of his national origin, which is Puerto Rican, and because of his sex.

The Commission acted upon these charges in accordance with the procedure enumerated in the Act. (Ill. Rev. Stat. 1971, ch. 48, par. 858.) First, an investigation was conducted and a conciliation conference ordered, but the attempted conciliation was unsuccessful. A complaint was then filed by the Commission on behalf of complainant. A public hearing was held before a hearing examiner at which conflicting evidence was presented. The hearing examiner entered findings of fact adverse to respondent's position and sustained the complaint by concluding that complainant had been discriminated against by respondent because of both his national origin and sex. Pursuant to a petition for review, the Commission sustained the hearing examiner's findings.

Respondent (hereinafter referred to as "plaintiff") then sought judicial review of the Commission's decision in the circuit court. (Ill. Rev. Stat. 1971, ch. 48, par. 860; Ill. Rev. Stat. 1971, ch. 110, par. 268.) The circuit court confirmed the Commission's decision, and this appeal followed.

All evidence adduced on this matter was before the hearing examiner. The pertinent facts follow.

The controversy arose from an altercation which occurred just after

midnight on Friday, December 17, 1971, outside of one of plaintiff's plants located in Cicero, Illinois.[1] On December 16, Ramon Rivas, Rosemary Castillo, and Jerald Fitzpatrick were working on the night shift in plaintiff's plant. Rivas and Castillo are Puerto Rican, and Fitzpatrick is a Negro.

During the work shift, Castillo reported to her foreman that Fitzpatrick and another Negro employee were misbehaving while performing their assembly line duties. The foreman investigated the matter, and the two employees were disciplined by being required to clean the work area at the end of the shift.

After work, Castillo and Rivas were walking together from the plant toward the employee parking lot across the street when they were approached by Fitzpatrick. Fitzpatrick commenced cursing Castillo and struck her in the face. Castillo testified that she then hit Fitzpatrick with a shopping bag. She further testified to the following account of what occurred next:

> "And I stay away from [Fitzpatrick] and he keep on following us. We was crossing the street and the same time was fighting, and the other side, when we got there he punched Ramon in the ear. He knock [Rivas] down and I opened my purse and give [Rivas] the nail file."

Rivas, armed with the file, pursued Fitzpatrick but was unable to catch him. A car containing eight Negro men then arrived on the scene. One of its passengers threw a knife to Fitzpatrick and suggested to Fitzpatrick to "Let him have it," whereupon Rivas picked up a two-by-four. That is when Fitzpatrick got into the car and departed, thus terminating the altercation.

At the administrative hearing, Rivas' account of the events which transpired on the evening of December 16 and the early morning of December 17 corroborated Castillo's testimony with two exceptions. First, Rivas stated that he did not chase Fitzpatrick. Second, Rivas testified that Castillo did not hit Fitzpatrick.

Fitzpatrick did not testify.

Evidence was adduced by plaintiff explaining its pertinent policies. For the purpose of providing a safe and agreeable working environment for its employees, plaintiff promulgated and strictly imposes a set of rules defining improper employee conduct. These rules are enumerated in a booklet entitled *Standard of Good Conduct,* a copy of which is distributed to each employee when they commence employment with the company. The rules are also explained to the employees during

---

[1] In the record, the date of the alleged fight is generally placed on December 16. However, it appears that the altercation actually occurred shortly after a work shift ended at midnight, and therefore, for the purpose of this opinion, December 17 will be referred to as the date of the occurrence which resulted in Rivas' discharge.

information sessions conducted by their foremen and in various company publications.

Because fighting and related incidents among employees may easily escalate to more serious episodes, plaintiff discourages and does not condone his conduct. When a report of such an incident is received by plaintiff's management personnel, an investigation is conducted to ascertain the circumstances of the alleged infraction of the rules. If the investigators determine that the report is supported by fact, an attempt is made to categorize the incident into one of three classifications of improper conduct: "fighting" involves an exchange of blows between two or more employees coupled with a mutual intent to do bodily harm; an "assault" occurs when one employee, the aggressor, approaches and hits another employee who is the victim of, as opposed to an active participant in, the altercation; and a "disturbance" results from a heated verbal dispute between two or more employees where physical contact does not occur. The normal penalty imposed by plaintiff on the combatants in a fight and on the aggressor in an assault is termination of employment, while the participants in a disturbance usually are suspended from work. Evidence presented by plaintiff established that neither the employee's duration of employment with plaintiff, nor his prior good work record will serve as a mitigating factor when an investigation reveals that an infraction of company rules has occurred.[2]

Pursuant to plaintiff's investigatory procedure, both the witnesses of and the alleged participants in the December 17 altercation were interviewed. While giving his account of the incident during the initial interview on December 17, Rivas lost his temper and stated: "If [Fitzpatrick] hit me again tonight, I going to get him."

On December 20, another fracas involving Rivas and Fitzpatrick occurred during the evening work shift. Rivas informed his foreman that Fitzpatrick had repeatedly approached him from behind and said "Excuse me." After stepping aside to allow Fitzpatrick to pass on three occasions, Rivas requested that he be left alone when this situation materialized a fourth time. Fitzpatrick responded with abusive language, and Rivas cautioned Fitzpatrick that "If you hit me again, you going to

---

[2] Evidence was introduced at the hearing as to Rivas' good work record and 16 years of employment with plaintiff, apparently as an indication that his discharge was discriminatory and not for cause. Plaintiff responded by producing records of its recent disciplinary actions which resulted in discharge. It is noteworthy that two employees, both male Caucasians, with good records were discharged after accumulating 39 and 19 years of service with the company.

We acknowledge that managerial decisions and considerations which affect employees but are nondiscriminatory are not proscribed by this Act. (See Ill. Rev. Stat. 1971, ch. 48, par. 851; cf. *Portable Electric Tools, Inc. v. NLRB* (7th Cir. 1962), 309 F.2d 423.) Consequently, questions of relevancy arise when the central issue pertains to discrimination and evidence tending to prove unreasonable and harsh managerial decisions is admitted.

remember me for all your life." Rivas discussed this episode with plaintiff's investigation committee.

It was subsequently brought to the investigator's attention that on December 21, Castillo had punched Rivas' time card, allowing him to leave the plant before the end of his work shift. Rivas explained to the committee that he had left the building early so as to avoid Fitzpatrick since he had been warned that Fitzpatrick planned to "get" him after work. While moving his car, Rivas was stopped and questioned briefly by Cicero police. A knife was observed in his car, but no charges were filed. Castillo admitted her participation in the time card incident and further related that she had been threatened by Fitzpatrick.

A few days later, Castillo received a letter from plaintiff advising that she had been suspended from work for 20 days because she had punched Rivas' time card.[3]

Rivas also received a letter from plaintiff, dated December 23, which in pertinent part read as follows:

"This notice is to confirm disciplinary action taken against you for the reason shown below:

Reason and just cause for action: Leaving own work area or Plant during working hours without permission; fighting, scuffling, or assaulting another employee or supervision; and threatening, intimidating, coercing, or interfering with employees or supervision. (Standard of Good Conduct Rules #13, 33, and 35)

Description of Circumstances: On Thursday, December 16, 1971 you were engaged in a fight with another employee. While this situation was being investigated you further threatened this employee and on Tuesday, December 21, 1971, you left the plant without permission.

Remarks: Conduct of this nature will not be tolerated. You are hereby suspended with recommendation for discharge. Notification of the final disposition of your case will be given you by Personnel."

By a letter dated January 10, Rivas was advised that he was discharged effective January 10.

When Castillo returned to work following her suspension, she was required to report to the office of John Zukowski, plaintiff's manager of shop operations. At that time, Castillo was informed that she was being transferred to another plant. When she asked if Rivas would be reinstated, Zukowski replied: "No, because Ramon had friends and enemies in that department and Kilpatrick [Fitzpatrick is incorrectly referred to as

---

[3] Castillo was charged with violating Rule 7 which provides the following as one type of improper employee conduct:

"Intentionally ringing the clock card of another employee or permitting others to ring your clock card."

"Kilpatrick" throughout much of the record] had the same thing." Due to the importance to the disposition of this appeal of Castillo's testimony pertaining to her conversation with Zukowski, that portion of the record will be quoted in its entirety:

> "HEARING EXAMINER LENNON: Did you say [Zukowski] said something about Fitzpatrick?
>
> THE WITNESS: Kilpatrick?
>
> HEARING EXAMINER LENNON: Yes, did you say he said something about him?
>
> THE WITNESS: Yes, Kilpatrick, the same thing, that he had friends and enemies; they both had friends and enemies in the department and that is why he let them go.
>
> HEARING EXAMINER LENNON: He let them both go?
>
> THE WITNESS: Yes, he laid them off, and I asked him 'Aren't you going to call him back?' He says 'No, you remember what happened before with that Puerto Rican who shot coloreds?' And I said 'Yes'. '* * * to prevent all of the problems that happened over there, that is why I can't call him back.' "

On direct examination, Zukowski denied telling Castillo that she was transferred to another plant because Rivas and Fitzpatrick had friends and enemies in the department. However, on cross-examination, Zukowski conceded that one reason contributing to Castillo's transfer was that she was a friend of Rivas and most employees in her work area were Fitzpatrick's friends. Zukowski further testified that during his conversation with Castillo he mentioned the fatal incident involving two Puerto Rican and two Negro employees for the sole purpose of emphasizing the seriousness of fighting among employees.

Plaintiff's manager of union relations made the final decision to discharge Rivas. In so doing, he followed the recommendations of Rivas' foreman and Zukowski. While testifying at the hearing, he voluntarily referred to the fatal incident involving Puerto Rican and Negro employees as an illustration supporting plaintiff's strict rules with respect to fighting. The witness was questioned about an incident in which two white employees were suspended. He explained that the investigating committee received conflicting statements as to whether a fight or an assault had occurred, but that the suspensions were justified since undisputed evidence revealed that a disturbance had occurred.[4]

The explanation for Rivas' discharge which was testified to by members of plaintiff's managerial staff characterized Rivas as a

---

[4] Other members of the investigating team testified. Most of these witnesses were neither aware of the fatal incident, nor the suspensions of the two white employees. However, these witnesses were more closely associated with the fact finding and reporting processes in this investigation and did not participate in the decision regarding disciplinary action.

participant in a "work related" fight. These witnesses reasoned that since the initial argument between Castillo and Fitzpatrick took place on plaintiff's premises and pertained to a work-related incident, Rivas' intervention in the ensuing struggle between Castillo and Fitzpatrick which occurred off of plaintiff's property rendered him a participant in a work-related dispute, notwithstanding the fact that he was not a party to the disagreement within the plant. When it was determined that the entire incident was work-related and thus subject to plaintiff's rules defining improper conduct, the committee endeavored to assemble all relevant facts. The disciplinary action which was subsequently taken was predicated upon those facts which were found to be undisputed. These witnesses conceded that Rivas' admission during the interviews that he had participated in a "fight" with Fitzpatrick was a controlling factor which contributed to his discharge; even though other eyewitnesses of the altercation informed the investigating committee that Rivas was engaged in a fight with Fitzpatrick, most of these persons were friends of Fitzpatrick, and thus, Rivas' admission was crucial to the committee's determinations.

After assessing the credibility of the witnesses, the hearing examiner found plaintiff's explanation of Rivas' discharge to be untruthful and "pretextual." The hearing examiner arrived at the following conclusion:

"It is my determination that the Company discharged Mr. Rivas because they feared a blow-up between the Blacks and the Puerto Ricans in the work area from which they came unless the Company discharged both of them. I have studied very carefully the Company's stated reasons as to why they did discharge Mr. Rivas. I find that I cannot credit the Company's witnesses because of their demeanor in testifying plus I find the Company's explanation as not worthy of belief."

Turning to the second ground cited by plaintiff in justification of Rivas' discharge—the allegation that Rivas had threatened another employee—the hearing examiner again rejected plaintiff's reasons for the penalty imposed:

"This is not the 'threat' the Company makes it to be. All Fitzpatrick had to do to avoid harm was to leave Mr. Rivas alone. Mr. Rivas had set up a condition precedent to his taking any action, namely Mr. Fitzpatrick hitting him. This was not on its face a threat to impose harm immediately."

And with respect to the time card incident, the hearing examiner determined that in accordance with plaintiff's enforcement of its rules, particularly in light of Castillo's suspension for her participation, Rivas would not have been discharged for this act alone.

The hearing examiner then made his finding of discrimination by plaintiff on account of Rivas' national origin with the following observations:

"Having rejected the Company's explanation, one had to look for the real reason. I think it was supplied in the conversation between Ms. Castillo and Mr. Zukowski. The Company was fearful of a racial incident or flare-up between Black and Puerto Rican workers. They were afraid of someone getting hurt. To prevent this they chose to get rid of the two participants who might light the fire. But, I find that they chose an illegal way to solve their problem. They fired Mr. Rivas because he happened to be a Puerto Rican who got into a fracas with a Black worker. Even though the Black worker was in the wrong, the Company chose the easy way out and fired both of them. Because I find that Mr. Rivas' National Origin played a significant role in the reason he was discharged, I find that the Company committed an Unfair Employment Practice in discharging him.

Moreover, it is 'well settled' in discriminatory discharge cases that inferences of discriminatory motive 'are strengthened by the fact that the explanation of the discharge offered by the respondent fails to stand under scrutiny.' N.L.R.B. v. Dant, 207 F.2d 165, 167 (9th Cir. 1953); [citing other authority]. For absent a credible explanation, there is no alternative to inferring unlawful motivation."

Upon plaintiff's petition for review, the Commission found sufficient evidence in the record to sustain the hearing examiner's findings, notwithstanding evidence of plaintiff's good record in minority employment practices. The Commission's decision was confirmed by the circuit court.

Before addressing the issues raised by this appeal, it should be noted initially that the parties to this cause, as indicated by their briefs, are in disagreement concerning the correct standard of review to be applied by this court when sitting in judicial review of a F.E.P.C. decision.

It is plaintiff's theory that since the Fair Employment Practices Act provides, in pertinent part, that "A determination sustaining a complaint shall be based upon a preponderance of the evidence" (Ill. Rev. Stat. 1971, ch. 48, par. 858(f)), a F.E.P.C. decision must be rejected by a reviewing court if that decision in the court's estimation is not supported by a preponderance of the evidence. Plaintiff cites *Motorola, Inc. v. Illinois Fair Employment Practices Com.*, 34 Ill. 2d 266, 215 N.E.2d 286, and *Chicago Transit Authority v. Fair Employment Practices Com.*, 103 Ill. App. 2d 329, 243 N.E.2d 638, as support for this proposition.

The view expressed by defendants, Rivas and the F.E.P.C., is that the findings and decision of the F.E.P.C., like any other administrative agency, can be set aside by a court of review only if they are against the manifest weight of the evidence. Defendants place principal reliance upon *A. P. Green Services Division of Bigelow-Liptak Corp. v. Fair Employment Practices Com.*, 19 Ill. App. 3d 875, 312 N.E.2d 314, on this point.

Judicial review of a F.E.P.C. order is obtained in accordance with the Administrative Review Act. (Ill. Rev. Stat. 1971, ch. 110, par. 264 *et seq.*; Ill. Rev. Stat. 1971, ch. 48, par. 860.) The scope of review of a reviewing court is limited to an examination, without the privilege of receiving any new or additional evidence in support of or in opposition to any finding or decision of the agency, of all questions of both law and fact presented by the record before it from any final decision of an administrative agency. In arriving at a determination with respect to the correctness of the action taken by the agency, "[t]he findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." (Ill. Rev. Stat. 1971, ch. 110, par. 274.) It is not the function of the reviewing court to reweigh the evidence, nor to make independent determinations of fact, which is the distinctive function of the agency in its role as the trier of fact. (*Bruce v. Department of Registration & Education*, 26 Ill. 2d 612, 187 N.E.2d 711.) The scope of judicial inquiry concerning factual determinations of the administrative agency is limited to ascertaining whether the agency's findings of fact are contrary to the manifest weight of the evidence. *Kerr v. Police Board*, 59 Ill. 2d 140, 319 N.E.2d 478.

Although the ambit of administrative review is well defined in Illinois, the parties' disagreement in the instant case as to the scope of review with respect to the findings of the F.E.P.C. is understandable. The requirement provided in the Fair Employment Practices Act that the determinations reached by a hearing examiner be based upon a preponderance of the evidence when sustaining a complaint filed pursuant to the Act is an unusual standard, and perhaps a unique test, in Illinois administrative law. In interpreting this statutory language, some cases have apparently suggested that the proper scope of judicial review of a F.E.P.C. decision encompasses ascertaining whether the findings and decision of the Commission are supported by a preponderance of the evidence. If this statement of the scope of review is correct, it also would be unique to Illinois administrative law.

Our research indicates that the Supreme Court has had only one opportunity to address this question. However, in that case, *Motorola, Inc. v. Illinois Fair Employment Practices Com.*, 34 Ill. 2d 266, 215 N.E.2d

286, the court did not enunciate the quantum of evidence required to be found by a court of review before sustaining a F.E.P.C. finding of discrimination.

In *Motorola*, a Negro applicant for employment with Motorola was administered an ability test. After Motorola failed to notify him of the results, he filed a complaint with the F.E.P.C. alleging that he was qualified for the position for which he applied, that he had passed the test, and that he was the subject of racial discrimination by Motorola. The procedural history of that case follows. A hearing was held before a hearing examiner, but complainant's test paper was not produced. The hearing examiner heard conflicting testimony and then resolved all issues in favor of complainant. Although the issue was neither raised by the pleadings, nor argued by counsel, the hearing examiner also found that the ability test did not " 'lend itself to equal opportunity to qualify for the hitherto culturally deprived and the disadvantaged groups.' " (34 Ill. 2d 266, 269, 215 N.E.2d 286, 288.) On review, the Commission received additional evidence directed to the issue of whether the ability test was inherently discriminatory, but subsequently ruled that this issue was not properly before it. The Commission then entered findings of fact adverse to Motorola's position on the charge of discrimination. The circuit court, while noting that if it had been the trier of fact it would not have made the same findings of fact reached by the Commission, held that the findings were supported by competent evidence from which reasonable men could draw an inference of discrimination. A direct appeal was then taken to the Supreme Court since the constitutionality of certain provisions of the Act was also being questioned.

Prior to examining the evidence, the court made the following comment:

> "Deference is unquestionably due the factual determinations of an agency charged with the primary responsibility for adjudication in a specialized area. [Citation.] The wisdom of this principle of judicial review is emphasized when the agency's area of competence involves the subtleties of conduct often present in cases of racial discrimination." (34 Ill. 2d 266, 274, 215 N.E.2d 286, 291.)

After reviewing the record, the court observed that a "suspicion" might reasonably remain that an unfair employment practice had been committed. Concluding that a mere suspicion cannot be elevated to the status of a preponderance of the evidence, the court held that "On the record in this case, we are of the opinion that the alleged unfair employment practice *was* not established by a preponderance of the evidence." (34 Ill. 2d 266, 282, 215 N.E.2d 286, 295.) (Emphasis added.) Accordingly, the judgment of the circuit court was reversed.

We are not persuaded that the court in *Motorola* engaged in a reweighing of the evidence for the purpose of making an independent determination of whether the Commission's finding of racial discrimination was actually supported by a preponderance of the evidence. Rather, we believe that the court carefully reviewed the evidence and considered inferences emanating therefrom for the limited purpose of determining whether the hearing examiner had applied the correct standard when evaluating the evidence and sustaining the complaint. In light of the hearing examiner's expressed finding that the ability test in question was inherently discriminatory, the court's concern as to whether the proper standard had been applied to the evidence by the examiner in determining that an unfair employment practice had been committed was justified. Indeed, it could have resulted in a miscarriage of justice if the Supreme Court had contented itself with ascertaining whether the Commission's decision was against the manifest weight of the evidence if that decision was not only arrived at through the application of a standard inconsistent with the statutory requirement, but also a standard which would more readily lead to a conclusion of discrimination.

■■ In accordance with our interpretation of *Motorola*, we deem the proper scope of judicial review of the findings and decision of the F.E.P.C. to be as follows: first, the reviewing court must determine if the agency applied the proper test to the evidence presented to it (see *Western Illinois Power Cooperative, Inc. v. Property Tax Appeal Board,* 29 Ill. App. 3d 16, 331 N.E.2d 286); second, if full compliance with the Act is manifested by a review of the record, the court must then determine whether the agency's determinations are against the manifest weight of the evidence. A rejection of those findings will then occur only if they are against the manifest weight of the evidence. The application of the dual aspects of this standard of review would assure compliance with statutory requirements while still lending "deference" to the determinations of the agency which is "unquestionably due."

■■ Although in the instant case neither the hearing examiner's recommended order, nor the Commission's decision expressly stated that the determinations upon which the complaint was sustained were based upon a preponderance of the evidence, after examining the record we conclude that the proper standard was employed by the hearing examiner when evaluating the evidence elicited before him. The examiner's report which was filed with the Commission indicates that he carefully considered the evidence which was adduced at the hearing, assessed the credibility of the witnesses testifying before him, and analyzed the inferences therefrom which he believed were reasonable under the circumstances of this case. We find nothing in the record to suggest that

the hearing examiner's determinations were based upon a mere suspicion of discrimination, or some other quantum of evidence less than a preponderance of the evidence.

Having determined that the proper standard was applied by the hearing examiner, we will consider the correctness of the Commission's decision, while mindful that the findings and conclusions of the agency on questions of fact are to be held prima facie true and correct.

Two decisive findings of fact were made by the hearing examiner. First, the examiner rejected plaintiff's explanation of Rivas' discharge that his employment was terminated because he violated three company rules. Second, the examiner found that the actual, but covert, reason for Rivas' discharge was to prevent a recurrence of racial tension in the plant between Puerto Rican and Negro employees. These two findings of fact constituted the controlling factors of the hearing examiner's recommended decision and provided the foundation to the Commission's decision.

■■ We hold that the first critical finding of fact is against the manifest weight of the evidence; the record adequately establishes Rivas' violation of three company rules governing proper employee conduct. In rejecting plaintiff's explanation of Rivas' discharge, the hearing examiner emphasized that Rivas did not *deserve* to be released. However, notwithstanding the possible lack of compassion by plaintiff in its disciplinary action taken against Rivas, the record amply reflects that Rivas engaged in conduct on at least three occasions which constituted a violation of three different company rules. Indeed, Rivas admitted such conduct. The hearing examiner analyzed each alleged infraction individually, and then concluded at the end of each analysis that that particular conduct did not warrant dismissal. We can only agree with the examiner's analysis to the extent that a flagrant violation of the rules was not manifested by Rivas' conduct. But it is quite conceivable that plaintiff viewed the cumulative effect of three rule violations as necessitating the termination of Rivas' employment.

■■ With respect to the second decisive finding of fact that the covert reason for the discharge of Rivas was to prevent a recurrence of racial tension in the plant between Puerto Rican and Negro employees, a review of the record convinces us that this finding of fact is not contrary to the manifest weight of the evidence. The hearing examiner concluded that the testimony of plaintiff's witnesses which attempted to explain the grounds justifying Rivas' discharge was merely a pretext, and that the sanction imposed was prompted by a fear of racial turmoil. In this regard, the examiner placed much emphasis upon the conversation between Castillo and Zukowski pertaining to an earlier fatal incident involving Puerto Rican and Negro employees. Also, plaintiff's manager of union

relations, the person who made the final decision to discharge Rivas, voluntarily referred to this fatal incident during his testimony. This evidence provides an adequate basis supporting this second finding of fact.

Thus, the legal issue raised by this factual situation is whether the discharge for cause of an employee by his employer constitutes a violation of the Fair Employment Practices Act when the decision to discharge, as opposed to taking a lesser form of disciplinary action, is motivated by a desire to prevent a recurrence of racial tension within the company.

Unlike findings of fact, a legal determination of discrimination is not presumptively established by the Commission's order. (*Chicago-Allis Manufacturing Corp. v. Fair Employment Practices Com.*, 32 Ill. App. 3d 392, 336 N.E.2d 40.) In the instant case, we cannot agree with the conclusion of law reached by the hearing examiner and approved by the Commission that the covert reason for Rivas' discharge under the circumstances of this case rendered his discharge discriminatory within the intended prohibition of disparate treatment provided by the Act.

We ask ourselves how the management personnel at General Electric, or any employer, is to effectively handle in another way a racially tense in-plant situation with due regard to the myriad other legal duties and responsibilities to which it must respond. We note that there is no evidence in the record, nor is it suggested in the Commission's decision, that General Electric created or nurtured the racial tension which supposedly existed among its Puerto Rican and Negro employees. However, racial tension was a fact of life with which plaintiff, as a private employer, had to deal. Moreover, that fact was not merely a generic fact, but rather a fact specifically applicable to plaintiff's in-plant activities by reason of the extremely serious outbreak of racial violence in plaintiff's plant which had occurred two years before. Plaintiff could not legally avoid that racial tension by refusing to hire either Puerto Ricans or Negroes, or both; such refusal, at least prima facie, would immediately run afoul of minority hiring practice prohibitions of the Act. Moreover, plaintiff was under a legal duty to provide all of its employees with a safe place in which to work. Consequently, in view of the fatal incident of two years before and the fact that Fitzpatrick was Negro and Rivas was Puerto Rican, and given the additional fact that on their assembly line Negroes, many of whom were friends of Fitzpatrick, outnumbered the Puerto Rican employees, we think that plaintiff had reason to fear that its failure to discharge Rivas, when indeed such disciplinary action was justified as the record more than adequately establishes due to Rivas' violation of three company rules, would endanger its other employees. Under all of these circumstances, we cannot believe that the discharge of

Rivas for the covert reason of preventing a recurrence of the racial violence between Puerto Ricans and Negroes of two years before rendered this discharge an instance of racially disparate treatment within the meaning of the Fair Employment Practices Act.

In support of our conclusion and as an illustration of the predicament in which an employer such as General Electric would be placed had we decided to the contrary, it is interesting to note that in its decision the Commission stated "It is almost inconceivable that Respondent's managerial personnel would not have considered the possibility of a recurrence of the [fatal] incident in making their determination." Thus, by entertaining considerations which the Commission concedes would be virtually impossible to ignore, plaintiff would automatically violate the Act if the disciplinary sanctions imposed by it are deemed undeserving by the Commission. We do not believe that the Act was intended to be applied in such a restrictive manner.

■■ We further note that several exhibits introduced by plaintiff reflecting previous disciplinary action taken by it suggest that Rivas would have been discharged irrespective of plaintiff's desire to stifle in-plant racial tension. Although we have agreed with the Commission that the covert reason outlined above was a motivating factor contributing to Rivas' discharge, it does not appear to us to have been the controlling factor since the fact remains that Rivas was also discharged for cause in a manner which we consider to be consistent with plaintiff's prior treatment of similar disciplinary problems.

With respect to the Commission's determination that plaintiff discriminated against Rivas on account of his sex, we hold that the findings of fact resulting in that legal conclusion are against the manifest weight of the evidence.

On cross-examination, Castillo reiterated her earlier testimony that she struck Fitzpatrick with a shopping bag during the altercation on December 17. However, Castillo testified that she did not reveal this fact to any of plaintiff's management personnel. Counsel then listed the dates on which Castillo allegedly was asked by plaintiff's investigating committee to describe what had occurred with respect to the incident. Castillo was able to recall each of those meetings. The critical question was then repeated by counsel:

"But at none of these [interviews] that I mentioned did you ever mention that you hit Mr. Fitzpatrick with a shopping bag."

Castillo responded that she did not inform plaintiff that she had hit Fitzpatrick.

■■ The hearing examiner's finding of sexual discrimination was predicated upon what appeared to be a disparity in disciplinary action taken against Rivas and Castillo for what appeared to be similar

involvement in the December 17 incident. But what must be considered is the facts which plaintiff's investigating committee had before it. Of all the persons interviewed by the committee, only Fitzpatrick stated that Castillo had hit him. Both Castillo and Rivas denied this allegation. And the statements made before the committee by other eyewitnesses, most of whom were friends of Fitzpatrick, tended to corroborate this portion of Castillo's version of the incident. Consequently, Castillo's status as an active participant in a "fight," as opposed to a victim of an "assault," was clearly in dispute. Upon these facts which were before the investigating committee, notwithstanding Castillo's testimony at the hearing, we find no evidence in the record indicating that Rivas was the subject of sexual discrimination.

In view of the foregoing, we reverse the judgment of the circuit court which confirmed the decision of the Fair Employment Practices Commission.

Reversed.

HAYES and DOWNING, JJ., concur.