NORTHERN ILLINOIS UNIVERSITY, Plaintiff-Appellant, *v.* FAIR EMPLOYMENT PRACTICES COMMISSION *et al.*, Defendants-Appellees.

Second District No. 76-493

Opinion filed March 6, 1978.—Rehearings denied April 6 and May 3, 1978.

Robert G. Coplan, of Connolly, Oliver, Goddard, Coplan & Close, of Rockford, for appellant.

William J. Scott, Attorney General, Carole K. Bellows, and J. Stuart Garbutt, all of Chicago (Patricia Rosen, Assistant Attorney General, of counsel), for appellees.

Mr. JUSTICE NASH delivered the opinion of the court:

Plaintiff, Northern Illinois University, appeals pursuant to the Administrative Review Act (Ill. Rev. Stat. 1971, ch. 110, par. 264 *et seq.*) from an order of the Circuit Court of DeKalb County affirming a decision of defendant, Fair Employment Practices Commission (hereinafter referred to as the Commission), that plaintiff had committed unfair employment practices as defined in section 3(a) of the Fair Employment Practices Act (Ill. Rev. Stat. 1971, ch. 48, par. 853(a)).

On March 26, 1973, Edna Barbour, an associate professor, filed a charge with the Commission and it thereafter issued a formal complaint on her behalf alleging that on or about January 26, 1973, plaintiff discriminated against her on the basis of her sex in determining the terms and conditions of her employment by plaintiff. While the original charge filed by Dr. Barbour was directed against the faculty rating system utilized by

plaintiff to determine annual salary increments of its tenured faculty, the hearing of that charge by the examiner appointed by the Commission, held in the spring and summer of 1974, also embraced a wide range of other discriminatory acts alleged to have been committed by plaintiff against Dr. Barbour. These included denying her a sabbatical leave, failure to promote her from the rank of associate professor to full professor and transferring her from the Department of Accountancy to the Department of Business Education both of which are in plaintiff's College of Business. The hearing examiner made certain findings and recommendations, which the Commission substantially adopted, finding that Northern Illinois University had committed these unfair employment practices regarding Dr. Barbour because of her sex and ordered plaintiff to cease such practices as to Dr. Barbour and others and, in order to eliminate what the Commission considered to be the effect upon Dr. Barbour of such practices, ordered plaintiff to expunge all faculty proficiency ratings made of Dr. Barbour after August 27, 1971 (the date discrimination based upon a person's sex became an unfair employment practice under the Act), from its personal records, promote her to full professor retroactive to the date she filed her charge with the Commission, grant her a paid six-month sabbatical leave, allow her to teach both accounting and data processing courses across departmental lines and award her back pay to August 27, 1971, in an amount to be subsequently determined.

In accordance with the Administrative Review Act (Ill. Rev. Stat. 1971, ch. 110, par. 264 *et seq.*) plaintiff sought review of the decision in the circuit court which affirmed the decision and order of the Commission and, on appeal, plaintiff contends the decision of the Commission is not supported by a preponderance of the evidence and that the far-reaching scope of its order exceeds any authority given the Commission by the Act. In view of our resolution of plaintiff's first contention we need not consider its second argument.

The Fair Employment Practices Act states the policy of the State of Illinois that equal employment opportunity shall not be denied because of a person's sex. (Ill. Rev. Stat. 1971, ch. 48, par. 851.) The Act prohibits unfair employment practices, including discrimination in the terms or conditions of employment, on that basis. (Ill. Rev. Stat. 1971, ch. 48, par. 853(a).) A hearing examiner or commissioner who takes evidence in a case makes a determination based upon that evidence whether the employer has engaged in unfair employment practices with regard to the person aggrieved, as charged in the complaint, and the Act provides that "[a] determination sustaining a complaint shall be based upon a preponderance of the evidence." (Ill. Rev. Stat. 1971, ch. 48, par. 858.01(c).) The findings and recommendations of the hearing examiner

are thereafter reviewed by the Commission which may adopt, modify or reverse them in whole or in part.

Judicial review of an order of the Commission must be had pursuant to the Administrative Review Act (Ill. Rev. Stat. 1971, ch. 110, par. 264 *et seq.*; Ill. Rev. Stat. 1971, ch. 48, par. 860) and, on such review, "[t]he findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." (Ill. Rev. Stat. 1971, ch. 110, par. 274.) The parties disagree as to the scope and standard of judicial review in the instant case and refer us to conflicting decisions of the Illinois courts. Our supreme court indirectly considered the standard to be applied on review of cases brought under the Fair Employment Practices Act in *Motorola, Inc. v. Illinois Fair Employment Practices Com.* (1966), 34 Ill. 2d 266, 215 N.E.2d 286, in which the court considered the evidence upon which the Commission had found a violation of the Act and determined that, while the evidence indicated some suspicion that a prospective employee's test score had been falsely recorded, "the alleged unfair employment practice was not established by a preponderance of the evidence." (34 Ill. 2d 266, 282, 215 N.E.2d 286, 295.) The court then reversed the decision of the Commission. In *Chicago Transit Authority v. Fair Employment Practices Com.* (1st Dist. 1968), 103 Ill. App. 2d 329, 243 N.E.2d 638, the court found that the "prima facie correct" presumption applicable to judicial review of all administrative agency decisions may only apply to decisions of the Fair Employment Practices Commission when it appears that the standard of proof by a preponderance of the evidence imposed by the legislature has been met. (103 Ill. App. 2d 329, 341, 243 N.E.2d 638, 644.) The court in *Moss-American, Inc. v. Illinois Fair Employment Practices Com.* (5th Dist. 1974), 22 Ill. App. 3d 248, 317 N.E.2d 343, adopted the preponderance of the evidence standard which it found meant "the greater weight of the evidence, not necessarily in numbers of witnesses, but in merit and worth that which has more evidence for it than against it * * *. Preponderance of the evidence is sufficient if it inclines an impartial and reasonable mind to one side rather than the other. [Citation.]" 22 Ill. App. 3d 248, 259, 317 N.E.2d 343, 351.

In *General Electric Co. v. Illinois Fair Employment Practices Com.* (1st Dist. 1976), 38 Ill. App. 3d 967, 349 N.E.2d 553, *appeal denied* (1976), 63 Ill. 2d 556, however, the court interpreted *Motorola* to hold only that the hearing examiner in that case had not applied the preponderance standard to the evidence as he is charged to do by statute. *General Electric* then holds that the court must apply two tests to an order or a decision of the Fair Employment Practices Commission.

"[F]irst, the reviewing court must determine if the agency applied the proper test to the evidence presented to it [citation]; second, if

full compliance with the Act is manifested by a review of the record, the court must then determine whether the agency's determinations are against the manifest weight of the evidence." (38 Ill. App. 3d 967, 977, 349 N.E.2d 553 561.) Subsequent decisions of the appellate court have also determined that the manifest weight standard is applicable to judicial review of Commission decisions. *Montgomery Ward & Co. v. Fair Employment Practices Com.* (1st Dist. 1977), 49 Ill. App. 3d 796, 802, 365 N.E.2d 535, 539; *Springfield-Sangamon County Regional Plan Com. v. Fair Employment Practices Com.* (4th Dist. 1976), 45 Ill. App. 3d 116, 127, 359 N.E.2d 174, 182, *rev'd in part on other grounds* (1978), 71 Ill. 2d 61, 373 N.E.2d 1307.

■■ While the Fair Employment Practices Act is unique in that it dictates the standard of proof to be applied by that administrative agency in making its determinations under the Act, we find no difference between the standard of review to be applied in the instant case and that which must be applied in the judicial review of any other administrative agency decision under the Administrative Review Act.[1] For these reasons, we hold the manifest weight of the evidence test to be applicable to judicial review of an administrative decision of the Fair Employment Practices Commission.

The major challenge in the instant case is directed to plaintiff's faculty rating system which is considered in determining faculty salary increments each year and which Dr. Barbour and the Commission deemed discriminated against her because she is a woman. Some general background information will be helpful to our analysis of this question. Dr. Barbour was, at the time of her complaint in 1973, an associate professor in the Department of Accountancy, one of five departments in the University's College of Business. Personnel matters, including salary increments, were within the jurisdiction of a departmental personnel committee which had the responsibility of evaluating the members of the faculty and making recommendations to the University for their respective annual salary increments. The College of Business is governed by a College Council composed of five members, one from each department, elected by other faculty members, together with the dean of the college. The University Council, a faculty governing board chosen by members of the various departments, also had a personnel committee which heard appeals in such matters.

[1] *E.g., Basketfield v. Police Board* (1974), 56 Ill. 2d 351, 358, 307 N.E.2d 371, 375; *Davern v. Civil Service Com.* (1970), 47 Ill. 2d 469, 471, 269 N.E.2d 713, 714, *cert. denied* (1971), 403 U.S. 918, 29 L. Ed. 2d 695, 91 S. Ct. 2229; *Fenyes v. State Employees' Retirement System* (1959), 17 Ill. 2d 106, 111, 160 N.E.2d 810, 813; *Mohler v. Department of Labor* (1951), 409 Ill. 79, 85, 97 N.E.2d 762, 765; *Rolando v. School Directors of District No. 125* (1976), 44 Ill. App. 3d 658, 661, 358 N.E.2d 945, 947; *Quincy Trading Post, Inc. v. Department of Revenue* (1973), 12 Ill. App. 3d 725, 732-33, 298 N.E.2d 789, 795; *Wolbach v. Zoning Board of Appeals* (1967), 82 Ill. App. 2d 288, 296, 226 N.E.2d 679, 683; *Zinser v. Board of Fire & Police Commissioners* (1961), 28 Ill. App. 2d 435, 438, 172 N.E.2d 33, 34.

The rating system relied upon by the personnel committee of Dr. Barbour's department considered three general factors in evaluating each faculty member's performance for the previous year: teaching effectiveness, scholarship and service. These considerations included any significant activities by a faculty member outside of teaching and other professional activities as well as service to the University. Each faculty member was rated by the committee on a scale of 0 to 10 in each of these three areas and the scores were then weighted so that teaching effectiveness made up 50% of the total and scholarship and service each 25%. The amount of the salary increment recommended by the personnel committee then bore a direct relationship to the total score given each of the respective faculty members. Any faculty member aggrieved by the recommendation of the personnel committee may appeal to both the Council of the College of Business and to the University Council personnel committee.

Student evaluations of teachers, made through surveys taken by the Student Advisory Board, have been utilized since 1970 by the personnel committee to help it evaluate the teaching effectiveness of the members of the faculty. The form for these evaluations included questions on the ability of the teacher to communicate, his or her understanding of the subject matter taught and the teacher's willingness to assist students out of class. Additional space was provided on such forms for students to make any other comments they may wish to make regarding the teacher's effectiveness. The students were not informed their evaluations help determine a faculty member's salary increment for the year and the individual members of the faculty may refuse to be evaluated by students, if they wish, although Dr. Barbour asserted she was not aware of that option. The personnel committee also considered general information received from students and other faculty members in making its evaluation. Committee work, particularly on the more important departmental and university committees, counted heavily toward the service aspect of the rating system and faculty members also received credit for publications or other scholarly work.

The personnel committee we have described, which applies the faculty rating system complained of in this case, is composed of three tentured faculty members who are elected annually by all members of the Accountancy Department's faculty to serve on that committee, together with the department chairman. Women faculty members serve regularly on such committees. It is Dr. Barbour's contention that because the rating system is so subjective it could be applied as a weapon for discrimination against her and other women faculty members and she concludes, therefore, it was applied unfavorably in her case for that reason.

In the years reflected by the evidence, Dr. Barbour did receive

extremely low ratings from the personnel committee. Her composite faculty rating based on teaching effectiveness, service and scholarly professional activities, on a scale of 0 to 10, was 2.0 for the year 1972 and 3.0 for 1973, while the average rating given other faculty members in her department for 1972 was 5.6. For that reason the department personnel committee recommended she receive only a $35 per month salary increment for the 1973-74 school year. Dr. Barbour appealed to the University Council personnel committee which then raised that increment to $60 per month and this recommendation was accepted by the Provost of the University. The record does not disclose the departmental personnel committee's increment recommendation for the school year 1974-75 but does reveal Dr. Barbour received an increment of $70 per month. Defendants contend that Dr. Barbour did not receive salary increments commensurate with her experience and ability and comparable to those received by male faculty members of her department because of discrimination against her based upon her sex.

Dr. Barbour received a Ph.D. in education from Ohio State University in 1955. When she was first employed by the College of Business of Northern Illinois University in 1957, it was in a formative stage and there were no departmental divisions. Dr. Barbour then taught business education, primarily teaching methods courses to prospective high school business teachers. Later, when the college was departmentalized, she was assigned to the Department of Business Education. In the early 1960s she studied accounting parttime at Northwestern University. In 1962 she was given a year's sabbatical leave at half pay, apparently to study for the C.P.A. examination. She was certified as a C.P.A. in 1965 and in 1967 was transferred to the Department of Accountancy. At the time her complaint was filed she had been primarily teaching data processing courses within the Department of Accountancy and, in addition, an occasional accounting course. During her 17 years at N.I.U. she had taught many different courses including two in elementary accounting, two in intermediate accounting and one in cost accounting. She did not teach any graduate level accounting courses and had taken only a few graduate level accounting courses herself while the average number of semester hours of graduate level accounting courses taken by the tenured accounting professors was about 20. The testimony was that she was not qualified to teach the higher level courses in that subject.

At the time the ratings to which she objects were made, the faculty service report submitted by Dr. Barbour to the personnel committee indicated she was serving on two minor committees and that she was in the process of writing a data processing manual. She was given credit by the committee for her work on the manual but was not given credit for

other community activities she listed, including Academic Women for Equality and church activities. Male faculty members also received no credit for activities of that kind. Student evaluations of Dr. Barbour's teaching were very low; several of her students testified on her behalf that she was a good or at least an average teacher, although one who had taken both data processing and accounting courses taught by her suggested she was a better teacher of the former. There was evidence that teaching effectiveness in accounting courses was accorded more weight than data processing courses by the Department of Accountancy personnel committee.

The department had 13 assistant, associate or full professors on its staff together with several instructors and graduate student assistants. Although she had been with the University for as long a period of time as any of the other members of the department faculty (except for Dr. Kathryn Iliff, a full professor), her salary was lower than any of the other four associate professors. While Dr. Barbour was paid $1930 per month in 1973-74 (and received a $60 per month increment), the male associate professors were paid monthly as follows: Dr. Cheng, $1965 ($75 increment), Dr. Poor, $2155 ($95 increment), Dr. Lahey, $2170 ($100 increment) and Dr. McClary, $2185 ($95 increment). Of the four full professors in the department, Dr. Iliff's salary was lower than any of the others, all males, and one associate professor, Dr. McClary, a man, received more salary than did Dr. Iliff, although it was contrary to department policy that a full professor be paid less than an associate professor. In addition to comparing her salary with the salaries of other associate professors in the Department of Accountancy, Dr. Barbour in her testimony specifically compared herself with the two other faculty members who taught data processing within that department. Dr. Scriven, a full professor, was employed on a 12-month basis both as a teacher and as Coordinator of Computer Systems for the College of Business. He taught two courses each semester in comparison with Dr. Barbour's three courses, but had several independent study students assigned to him and, in addition, had administrative duties. His faculty service report indicates several publications by him and service on numerous committees. While his ratings for teaching were not as low as Dr. Barbour's, they were below average. In 1973 he received a salary increment of $100 per month. Mr. Barnes, a non-Ph.D. assistant professor, was employed on an 11-month basis. He, too, taught two courses each semester and received a $75 per month increment in 1973. He had additional duties in his position as administrator of the data processing laboratory. While Dr. Barbour's salary was compared unfavorably with the other associate professors in her department, her comparisons with

Dr. Scriven and Mr. Barnes are not convincing because of their additional administrative positions. She was paid more on a monthly basis than any assistant professor, and, of course, less than any full professor.

The department chairman testified that in addition to the basic accountancy courses taught by Dr. Barbour the department offered advanced courses in tax, managerial and cost accounting, auditing, financial accounting and governmental accounting. Dr. Barbour was not qualified by training or experience to teach in any of these specialized areas. Further, there was no evidence Dr. Barbour was prevented by reason of her sex from being elected or appointed to any university-wide or departmental committees. Other women faculty members often served on the most important committees at both levels, but she seldom did so by either election or appointment. Whether she did not wish to so serve or was unable to be elected by her peers to these committees is not disclosed by the record.

■■ Dr. Barbour has attempted to show, through comparisons with other faculty members, that plaintiff, through its rating system, discriminated against her because of her sex. In order to do so it must first be shown by a preponderance of the evidence that differences in treatment did exist, then, that these differences were premised on Dr. Barbour's sex. The mere fact that she was the lowest paid of the five associate professors in her department is not sufficient to prove sex discrimination. While the criteria utilized by plaintiff's faculty personnel committee to determine salary increments are necessarily subjective and could be misused, there is no evidence they have in fact been misused or that any disparity in salary or annual increments between plaintiff and other faculty members was based upon her sex. It is only by attempting to ascertain such intangibles as the ability of a faculty member to teach that plaintiff can reward the best teachers and thus induce them to remain with the University. Because such a rating system is subjective, as indeed it must be, it does not follow that it discriminates between faculty members because of their sex. As we view it, the rating system objected to here was designed to identify those more proficient and better teachers in the department and then to discriminate in their favor and against those with lesser abilities in the matter of salary: an entirely proper purpose entirely unrelated to the sex of the teacher.

While plaintiff could not be permitted to utilize the subjective rating system in question here as an instrument for sex discrimination, we see no evidence of any effort by it to do so directed at Dr. Barbour or any other woman faculty member. The basic assumption made by the Commission and its hearing examiner from this evidence appears to be that all treatment differences between Dr. Barbour and men faculty members necessarily are based upon discrimination prohibited by the Act. They

overlook the fact that there obviously are many real and rational differences other than sex which may properly account for differences in treatment between particular male and female faculty members and to the advantage of either. It has been perhaps overlooked here by the Commission that the role of a faculty member at the university level is to lend prestige to the institution through superior teaching, community and professional service and scholarly work. Under the record of this case it is apparent that Dr. Barbour has failed to impress her fellow faculty members with her credentials in these respects and they have rightfully chosen not to reward her with salary increments to the extent earned by some other members of the faculty. The decision of the Commission that Dr. Barbour was discriminated against because of her sex with regard to her wages was against the manifest weight of the evidence.

■■ The Commission's determination that Dr. Barbour had not in the past been promoted to full professor because of sexual discrimination against her is similarly unsupported by the evidence. She was, during the time in issue, on the faculty of the Department of Accountancy in the College of Business of the University. The record discloses that within the College of Business there is a female faculty membership of 12 women, 4 of whom are full professors and 2 of whom are associate professors, as is Dr. Barbour. Clearly women are not prevented from becoming full professors on account of their sex. No faculty member within the Department of Accountancy has been promoted to full professor from 1970 through the time this case was heard by the Commission. In 1972 the University Council formulated draft guidelines for promotion to full professor in the University which state that such an individual should have achieved a "significant professional recognition" in his or her discipline through scholarly work and professional activity in addition to a "demonstrated ability in teaching." Whether Dr. Barbour satisfied these criteria is for the judgment of plaintiff in the absence of evidence of unlawful discrimination and we find none exists here. As there is no evidence in this case suggesting that she was not treated like all other faculty members with regard to promotion to full professor, the Commission may not interfere with plaintiff's decision in that regard.[2]

■■ The Commission also found that plaintiff discriminated against Dr. Barbour when it denied her a paid sabbatical leave in 1972 for the purpose of taking advanced data processing courses at U.C.L.A. It appears that over the entire university there is one paid sabbatical leave granted annually for approximately each 25 faculty members. Of the seven proposals requesting sabbatical leave from the College of Business,

---

[2] See generally *Sweeney v. Board of Trustees* (1st Cir. 1978), 569 F. 2d 169; *Cussler v. University of Maryland* (D. Md. 1977), 430 F. Supp. 602.

Dr. Barbour's was ranked last by the College Council and her request was ultimately denied for the reason that it lacked specificity. The other six applicants, who were all men, were granted their requested leaves. The record also discloses that Dr. Barbour had in previous years received a one-year half-pay sabbatical from the University while the six successful applicants, on this occasion, had not previously been granted this privilege during their tenure with the University.

The determination of the hearing examiner and the Commission that the action of plaintiff in failing to grant Dr. Barbour's application was based on discrimination against her because she is female has no support in the evidence. There is nothing in the record indicating the decision was sexually premised and the mere fact her application was ranked last was adequately explained by plaintiff.

■■ Dr. Barbour's final contention was that she was discriminated against by a shift of the data processing courses taught by her from the Department of Accountancy to the Department of Business Education. This transfer was effective June 1, 1974, and Dr. Barbour was given a choice regarding which of the departments she would join. She discussed this decision with Dean Thistlethwaite of the College of Business who suggested she should follow the data processing courses to the Department of Business Education because the bulk of her teaching and extra work had most recently been in that field. Dr. Barbour now argues she will be unable to teach those elementary accounting courses she had previously taught because she will not be allowed to teach across departmental lines and might then also lose the opportunity to teach summer school courses. Dr. Barbour had taught data processing courses in the summers immediately preceding the hearing of her charge. Dean Thistlethwaite denied he ever told Dr. Barbour she would be unable to teach across departmental lines. Dr. Barbour additionally argues that she will be discriminated against because two male professors from the College of Education have been allowed to teach advanced data processing and accounting courses in the Department of Accountancy. Plaintiff responds that these are specialized courses designed primarily for education students and that the two male professors are particularly and specially qualified to teach them.

While the Commission found no evidence to support the finding made by the hearing examiner that the transfer of the data processing courses from the Department of Accountancy to the Department of Business Education was designed to discriminate against Dr. Barbour, and while there is no evidence she will lose any opportunity to teach summer school or that she will not, on occasion, be asked to teach an accounting course across departmental lines, the Commission directed that she be allowed to teach accounting across departmental lines at her pleasure. There is no

evidence in this case of any discrimination against her and she has voiced only speculative fears of future discrimination in this regard. The Commission had no evidence upon which to premise its order and its decision and order in this regard are against the manifest weight of the evidence.

For the reasons stated the decision and orders of the Fair Employment Practices Commission and the Circuit Court of DeKalb County are reversed.

Reversed.

SEIDENFELD, P. J., and BOYLE, J., concur.