WEIGEL BROADCASTING COMPANY, d/b/a WCIU-TV, Channel 26, Plaintiff-Appellee, *v.* RHEA M. HAMMER, Defendant-Appellant.

First District (5th Division)   No. 77-1065

Opinion filed December 8, 1978.

Virginia Martinez, of Chicago, and Joyce Gradel, of Oak Park (Patricia Vasquez, of San Antonio, Texas, of counsel), for appellant.

Bernard Weisberg and Jack B. Schmetterer, both of Gottlieb and Schwartz, of Chicago, for appellee.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Plaintiff filed a complaint under the Administrative Review Act (Ill. Rev. Stat. 1975, ch. 110, par. 264 *et seq.*) for review of a final order

entered by the Illinois Fair Employment Practices Commission (FEPC), regarding defendant's charges of unfair employment practices. The circuit court affirmed the FEPC's order and decision in part, reversed it in part, and remanded the cause with directions. On appeal, defendant contends that the portion of the court's order which reversed the FEPC in part is erroneous and should be reversed.

The following facts are pertinent to the disposition of this appeal.

On June 22, 1973, defendant filed a charge with the FEPC alleging that plaintiff, her employer, was discriminating against her because of her sex and national origin. By stipulation of the parties, the matter was continued for investigation and conciliation. On January 3, 1974, defendant filed amended charges which repeated her claims of employment discrimination and further alleged that plaintiff had discharged her in retaliation for her filing of the original charge with the FEPC. The parties were unable to reach a settlement and, on February 19, 1974, the FEPC issued a complaint of unfair employment practice. After plaintiff filed an answer, a hearing was held before an FEPC hearing examiner, and the following pertinent evidence was adduced.

*For Defendant*
  *Rhea Mojica Hammer on her own behalf*
  She is a Mexican-American, and is fluent in Spanish and English. She was hired by WCIU-TV in 1970, and worked on a live community service program for Spanish speaking people called "Ayuda." In August 1972, WBBM-TV, the CBS affiliate in Chicago, offered her a job as hostess of a television program. She indicated to J. W. O'Connor, WCIU's station manager, that she wished to accept WBBM's offer and be set free from her contract with WCIU. She subsequently met with Howard Shapiro, chairman of the board of WCIU. He told her that while they were not going to prevent her from leaving, he wanted to offer her the position of Executive Director of Spanish Programming. He described certain duties the job would entail and promised that she would get a substantial increase in pay. He agreed, at her suggestion, that she would be allowed to do the news on the air, and that a press release announcing her appointment would be released. She accepted Shapiro's offer and said she would communicate to WBBM that she declined their offer. A week after the conversation, J. W. O'Connor, who was the person in management she dealt with directly, told her she could have a private office, and could choose any of the rooms that were empty. He also told her that she would be getting pay increases which by December of 1972 would total $200 a week. She received those increases. Although no announcement of her new position was made, WCIU did provide her, at their expense, with business cards which contained her name and new title. She subsequently performed various assignments including going on the air and doing the

news. She was also given permission by Howard Shapiro to work one day a week as hostess on television programs being taped at WBBM-TV. She had two conversations with J. W. O'Connor at the end of 1972 or beginning of 1973. He told her that a Mr. Lopez and certain other Spanish-speaking male employees were objecting to her role, saying that they could not accept a woman as director. On May 3, 1973, she was visited by WCIU's vice-president and general manager, Herman Sitrick. He told her that due to a decrease in WCIU's sales her position would be terminated, effective June 15. He offered her a position as sales person, and told her that she would make much more money there than as executive director of Spanish programming.

She declined to accept this offer and asked that her position be defined. She was sent a memorandum on June 18 which said that she was "reinstated on the payroll" but would not be involved with "old duties." The memo said she would temporarily be assigned to making phone calls, regarding the station's FCC license renewal, under the supervision of Fran Lindstrom. She filed her original charge of discrimination based on sex and national origin with the FEPC on June 22, 1973. She subsequently discussed her situation with Howard Shapiro. At one point during the discussion he said, "Rhea, if you are so unhappy, why don't you leave?" and she responded by stating that he could terminate her. She continued to make community "ascertainment" phone calls which were needed in regard to the license renewal. She was "pressed" by Shapiro that she was not making enough calls. Other than making those calls, she did "mostly nothing." On November 20, 1973, she met with Shapiro. He asked her what she did with her time, and she said "I read the newspaper and magazines with the door open. * * * because I have nothing to do." Shapiro suggested that if she was unhappy, she should begin to look for another job, but she said that if he was unhappy he should take appropriate action and put it in writing. She received a termination memo that day and left the station. Her lack of work was caused by the fact that since she finished working on the station's license renewal, which was filed in August, she had not received any assignment. When she told Shapiro this he did give her "several things to do" and she did them. She never refused any assignment.

On cross-examination she admitted that she authorized the release of an announcement that she was executive director of Spanish programming at WCIU-TV from September 1972 until November 1973, even though that position had been terminated in June. She conceded that on August 13, 1973, she was appointed special assistant to the president, Howard Shapiro, and she worked on assignments he gave her. She acknowledged that in the beginning of June 1973, she refused any directions to appear on the air, saying that she would not do so until her

"situation was resolved one way or the other." She conceded that prior to working at WCIU-TV she had no previous experience on television. She acknowledged that in May of 1973, she took a 10-working-day vacation without prior notification to anyone at WCIU. From September 1972 to May 1972, she worked at WBBM-TV one day a week, which she had been allowed to do, and spent a minimum of 35 hours per week at WCIU. She spent a small amount of that time on personal matters. She got along reasonably well with most of the WCIU employees. She acknowledged that on "several occasions" from May 3 through November 20 she asked Howard Shapiro and J. W. O'Connor to terminate her employment.

## For Plaintiff

### Frances Lindstrom

In June of 1973, Rhea Hammer was assigned to work with her on the station's FCC license renewal project. On July 2, 1973, she wrote a memo to J. W. O'Connor regarding the lack of work being done on that project by Ms. Hammer. Approximately 600 calls needed to be made in connection with the project. Ms. Hammer completed a total of 199 calls, while another woman named Joette, who worked on the project part time in June and then in July, completed 222 calls. She had occasion to pass by Hammer's office and noticed that she was often looking at magazines, writing notes or talking on the phone. Lindstrom would at times wait to speak to Ms. Hammer, and she observed that her phone calls did not always concern the license renewal project. She occasionally received complaints from other employees about Ms. Hammer.

On cross-examination she acknowledged that Rhea was requested to make Spanish speaking calls as much as possible and recalled that in June and July of 1973 the phone calls were Rhea's only assignment. She acknowledged that Rhea did the "recap" of all of the project's calls.

### J. W. O'Connor

He is chairman of the board and was previously president of WCIU-TV. He substantially corroborated Rhea Hammer's account of how she was offered the position of executive director of Spanish programming. Although she did receive her own office and the wage increases that were promised, she was not actually appointed to the position due to the reaction of the Spanish language department. Specifically, Lilly Acala, Henry Lopez and Armando Perez had such violent opposition that if the appointment had been made, they all would have refused to continue working. He was also told by Ed Scotch, a producer at WCIU, that Rhea Hammer was not very interested in Spanish programming, was no longer cooperative, and would be a bad choice for the executive position. He told Rhea of the negative reaction of the Spanish department and that she therefore would not receive the appointment. She was very upset that

those people were against her. He wanted to keep Rhea and the other employees too, so he directed that Rhea be offered a position in sales and talent. He learned, however, that Rhea was not interested in that or anything else except executive director of Spanish programming. In May of 1973, Rhea Hammer went away on vacation, although she did not inform him that she was leaving. When she returned he tried to convince her to accept the new position, but she refused. At the end of May 1973, because he still thought Rhea was a valuable employee who should stay with the station, he assigned her to make FCC license renewal phone calls for the duration of the summer. In light of FCC requirements, the station has a need for a woman executive, and especially for a Chicano. Because of this and because he and others in management liked Rhea, believed in her and thought she was competent, he continued to hope that some arrangement could be made so that she could remain with the station.

On cross-examination he denied ever discussing the discharge of Rhea Hammer with the station management, but stated that he did discuss how to keep her and "create some peace out of the chaos."

*Howard Shapiro*

Since July 1, 1973, he has served as president of WCIU and before that he was chairman of the board. In late 1972 he had lunch with Rhea Hammer, told her about the plans the station had to improve and expand, particularly in the area of Spanish programming, and tried to convince her to stay with the station. He did not specifically describe her capacity as being the director of Spanish programming because that specific an assignment would not have been in his domain at the time. Ms. Hammer decided to stay with the station. On July 1, 1973, he took over day to day operations of the station and soon learned "that Rhea was terribly unhappy and everyone was unhappy with Rhea." Over 20 other employees complained to him that it was difficult and almost impossible to work with her. She complained to him that they had reneged on a promise to her and that "almost anybody" could tell her what to do. In an effort "to save the relationship" between her and the station, on approximately August 15, 1973, he appointed her "special assistant to the president," and told her any assignments to her would come only through him. He assigned her to work on a seminar explaining the Spanish programming, and to prepare a local Spanish public service an-nouncement. She did nothing on these assignments other than some very superficial investigatory work, and despite his repeated requests, she did not complete either assignment. To the best of his knowledge "she had been doing nothing for quite a while." When he discussed this with her she complained about her problems and said that nobody was treating her correctly. On two occasions she asked him to fire her. On November 20, 1973, because she was not doing any work, she could not

get along with anyone, no one could get along with her, and the situation was clearly not going to improve, he sent her a memo terminating her employment. He knew about her relations with other employees because she repeatedly complained to him that she could not get along with them, and several of them called and complained about her. He did not fire her because she was a woman, a Chicano, or because she had filed a charge with the FEPC.

On cross-examination, he denied telling Rhea that he was going to appoint her effective immediately, as executive director of Spanish programming. He did not discuss any specific job with her at that luncheon, but did promise that she would have an enlarged role in the station's Spanish programming. He acknowledged that he talked to Rhea shortly after he received notice of the charge she had filed with the FEPC, but denied that he asked her to leave if she was unhappy.

He recalled that the problems other employees complained of having with Rhea were her noncooperation, noncommunication and nonavailability. He acknowledged that before terminating her he inquired into her contribution to the FCC license renewal phone calls that J. W. O'Connor had assigned to her while he was still president. He learned that her work on this assignment was a very small portion of what she should have done. He admitted that the license renewal was filed on time.

### Lillian Acala

She is employed by WCIU-TV, currently as assistant producer of Spanish programming. She worked with Rhea Hammer on the Ayuda program for close to two years. In September of 1972 she went to J. W. O'Connor's office to complain about Rhea Hammer. She heard complaints from other people that she did not receive phone calls when Rhea was at the switchboard. She complained in general about her behavior and asked that Rhea stay away from her. At this period of time, Rhea would always come in late, take personal calls while she was there, and take the credit for things that she had not done.

On cross-examination, she acknowledged that Rhea never missed any of the programs she was supposed to appear on and missed no more than two of the weekly meetings she was supposed to attend. She denied ever telling J. W. O'Connor that she didn't want Rhea to be executive director of Spanish programming or that with Rhea's rise to fame she had become impossible to work with.

### Henry Lopez

He has worked at WCIU since 1964 and is currently the Spanish news director. In September of 1972, he talked to J. W. O'Connor about the news that Rhea Hammer was going to be program director. He told O'Connor that if she took that position he would have to resign. O'Connor

asked him why, and he explained that Hammer did not know anything about what she was going to ask or order other employees to do, and she simply did not have the experience needed to handle the job. He also told O'Connor that when Hammer speaks Spanish she makes many mistakes and that they had received complaints from the public about her use of the language. He never told O'Connor that Hammer should not be executive director of Spanish programming because she was a woman or a Chicano. As of the fall of 1972 after she had run for Congress, she did not devote much time to her work and appeared to be overly self-important.

On cross-examination he admitted that prior to the fall of 1972 he had never made any complaints about Rhea's work.

*Peter Zomaya*

He has been assistant general manager of WCIU since January 1973. From January until June of that year he was Rhea Hammer's most immediate supervisor. During that time he was unhappy with her attitude, which he thought was very arrogant. He also received comments from several employees which were critical of her use or knowledge of Spanish. In June 1973 Rhea was spending a considerable amount of time on personal matters, either on the phone or outside the office. She became impossible to communicate with. In her work on the FCC license renewal project she was expected to complete approximately 25 calls per day, but was turning in between five and eight. She continued to have the same noncaring attitude through the summer of 1973. When he told her that her attitude was "the wrong approach to take with management," she told him, "I'm not going to bend over to kiss anybody's ass." In July of 1973 he learned that when a guest on a live show did not show up Rhea did not have a standby guest or prepared remarks, but instead "winged it" and talked to fill 15 minutes. When he stressed to her the importance of having something prepared in advance, she was difficult and uncooperative. After August 13, 1973, when Rhea became special assistant to the president, he observed that her personal phone calls continued.

On cross-examination he conceded that he did not speak or write Spanish. He acknowledged that he never listened to Rhea's entire phone conversations, but that from the portions he heard he could tell they were often personal calls. He acknowledged that the license renewal was filed with the FCC in time. He acknowledged that every host of a show at WCIU does not submit a standby script in advance in every case. He admitted that occasionally he received personal calls at the station.

*For Defendant on rebuttal*

*Rhea Mojica Hammer on her own behalf*

After leaving the Ayuda program in August of 1972, she put in a minimum of 35 hours and sometimes 45 hours a week at WCIU. Prior to

June of 1973 she had not received any complaints about her work attendance. She received an average of two or three personal phone calls a day while at work, including daily calls from her daughter and a personal friend named Mr. Gonzales, but she made them as short as possible. She never spent more than 10 minutes on one personal call. At no time after August 1972 did she take phone calls for Lilly Acala. In 1970 when she was first interviewed by Ed Scotch for a position at WCIU, she told him that her Spanish ability was about two-thirds of her English ability. Scotch had her talk for approximately half an hour with an expert Spanish teacher who said that he found her Spanish satisfactory and would recommend her for employment. When she began working for WCIU she made an arrangement with Henry Lopez that she would help him with his English and he would help her with her Spanish. In the beginning of 1973, when she pressed J. W. O'Connor for an announcement of her executive position, he told her that some of the Spanish speaking employees would not accept her because she was a woman. When she complained that this should not be a problem, he told her to be patient while they worked at it. In the summer of 1973 she worked on preparing a Spanish seminar, which was one of the two or three assignments Howard Shapiro gave her. She contacted various hotels, drafted a schedule and reported once or twice to Shapiro. She also worked on a public service calendar. She drafted a format and set up zone topics of discussion. She discussed these verbally with Shapiro although she did not hand them in. She did hand in a memo concerning the dates and format for a promotional party for Spanish programming. At some time after June 1973, she told Shapiro that she was having problems with other employees because it was known she had filed a grievance. When working on the phone calls for the FCC license renewal, she tried to complete 28 calls each day. She could not do so, however, because of other work she was doing for WCIU and because the Spanish speaking people she called would often recognize her as a personality and engage her in conversation. When all the data from the callers was in, she helped Mrs. Lindstrom assemble and type it. Prior to her filing a charge with the FEPC she had not had complaints from management concerning her work or difficulties with fellow employees.

On cross-examination she acknowledged that at no time during her employment at WCIU was her salary stopped or reduced.

Following this hearing the hearing examiner found that defendant's original charge of sex discrimination had legal merit, and that WCIU's subsequent course of conduct, including its termination of defendant's employment, was "illegal." He therefore recommended to the FEPC that plaintiff offer defendant the job of executive director of Spanish programming, give her appropriate back pay, plus interest, and pay her reasonable attorney's fees and costs. Plaintiff filed a petition for review of

the examiner's recommendations with the FEPC, which issued its decision on February 11, 1976. The FEPC reviewed the evidence which had been adduced before the hearing examiner and ordered, *inter alia,* that defendant's complaints of discrimination because of sex and retaliatory discharge from employment were sustained, that her complaint of discrimination because of national origin was reversed, that plaintiff should offer to reinstate her in the position of executive director of Spanish programming or to a similar position, and that plaintiff give her back pay in the manner recommended by the hearing examiner. Plaintiff filed its petition for administrative review in the circuit court on March 17, 1976. Following the submission of briefs and oral argument the court issued an order on April 21, 1977, which affirmed the FEPC's order insofar as it dismissed defendant's charge of discrimination based on national origin and sustained her charge of discrimination based on sex. The court reversed the FEPC's order insofar as it sustained defendant's charge that she was discharged in retaliation for having filed her claim of discrimination. The court further instructed the FEPC that reinstatement and back pay were inappropriate remedies in this case, and remanded the case to the FEPC so that a more appropriate sanction for plaintiff's sex discrimination could be imposed. From the portion of the court's order which reversed the FEPC's decision that defendant was discharged in retaliation for having filed claim of discrimination, defendant now appeals.

OPINION

■■ We note initially that this appeal does not involve the portion of the trial court's order which remanded the case to the FEPC so that a more appropriate sanction against plaintiff could be imposed. Defendant properly does not appeal from that remanding order, since such order is interlocutory in nature and not appealable. (See *Nichols v. Industrial Com.* (1971), 49 Ill. 2d 431, 274 N.E.2d 48.) Defendant does contend, however, that the trial court erred in reversing the FEPC's decision on retaliation. Proceedings on this matter before the FEPC were governed by the Fair Employment Practices Act. (Ill. Rev. Stat. 1975, ch. 48, par. 851 *et seq.*). Section 8.01(c) of the Act, in pertinent part, cautions the FEPC that "[a] determination sustaining a complaint shall be based upon a preponderance of the evidence." (Ill. Rev. Stat. 1975, ch. 48, par. 858.01(c).) Under section 10 of the same Act (Ill. Rev. Stat. 1975, ch. 48, par. 860), judicial review of an FEPC decision may be had in accordance with the terms of the Administrative Review Act. (Ill. Rev. Stat. 1975, ch. 110, par. 264 *et seq.*) Section 11 of the Administrative Review Act provides that:

"No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court. The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." (Ill. Rev. Stat. 1975, ch. 110, par. 274.)

Under this provision, the reviewing court's function is to ascertain whether the findings and decisions of the administrative agency are against the manifest weight of the evidence. (*Montgomery Ward & Co. v. Fair Employment Practices Com.* (1977), 49 Ill. App. 3d 796, 365 N.E.2d 535.) If the findings are held to be against the manifest weight of the evidence, it is wholly proper for the court to reverse. (See *Southern Illinois Asphalt Co. v. Pollution Control Board* (1975), 60 Ill. 2d 204, 326 N.E.2d 406; *Lieberman v. Rochford* (1976), 43 Ill. App. 3d 1001, 358 N.E.2d 287.) Based on the foregoing, in *General Electric Co. v. Illinois Fair Employment Practices Com.* (1976), 38 Ill. App. 3d 967, 977, 349 N.E.2d 553, 561, we defined the proper scope of review of the FEPC's findings and decision to be as follows:

"[F]irst, the reviewing court must determine if the agency applied the proper [preponderance of the evidence] test to the evidence presented to it [citation]; second, if full compliance with the Act is manifested by a review of the record, the court must then determine whether the agency's determinations are against the manifest weight of the evidence. A rejection of those findings will then occur only if they are against the manifest weight of the evidence."

■ The parties to this appeal agree that the above is the correct standard, and that the trial judge in the oral opinion incorporated in his written order, correctly stated it as controlling the disposition of this case. Defendant contends, however, that the trial court's conclusion that the FEPC's decision did not meet the required standard and was in fact against the manifest weight of the evidence is an erroneous one and should be reversed. We disagree. We accept defendant's statement that in order to reverse the finding of the FEPC as being against the manifest weight of the evidence, the trial court had to find sufficient evidence in the record to make an opposite finding "clearly evident." (*Division-Kostner Currency Exchange, Inc. v. Montgomery* (1974), 18 Ill. App. 3d 225, 228, 309 N.E.2d 614, 617.) However, we specifically reject her assertion that in reaching its decision in this case, the trial court improperly went beyond its proscribed functions and made independent determinations of the facts and the credibility of witnesses. For the trial court to make such independent determinations based on the administrative record would

obviously be improper. (See *Bruce v. Department of Registration & Education* (1963), 26 Ill. 2d 612, 187 N.E.2d 711; *Davenport v. Board of Fire & Police Commissioners* (1972), 2 Ill. App. 3d 864, 278 N.E.2d 212.) A reading of the trial court's oral opinion, however, clearly shows a constant awareness of this limitation upon the judicial reviewing function. Accordingly, regarding defendant's charge of sex discrimination, the trial court stated that:

> "[C]onsiderable conflicting testimony was heard. And as the [FEPC] Hearing Officer noted, resolving this problem necessitated, unavoidably, the resolution of credibility. He then stated and I quote, 'I have credited the complainant's version.'
>
> This is a proper and exclusive function of the hearing office [*sic*] in a role which the Circuit Court is directed to avoid in administrative review. In this regard I could not substitute my opinion as to the credibility for that of the Hearing Officer."

The court therefore concluded that the finding of the FEPC sustaining defendant's charge of sex discrimination would be affirmed. The trial court also found, however, that a fair reading of the entire record, and especially certain evidence which was not contradicted or otherwise made a part of a question of credibility, clearly led to the conclusion that the FEPC's finding of retaliation was against the manifest weight of the evidence.

■■■ After a careful review of the evidence in the record on appeal we conclude that the trial court was correct in its determination. It is true, as the FEPC found, that defendant established a prima facie case of retaliation by showing that she was a competent employee who filed a charge with the FEPC and was subsequently terminated. Plaintiff thereafter had the burden of establishing that her termination was for proper cause. However, "[i]f the employer discharges his burden of proof and meets the prima facie case * * *, the burden of proof then shifts back to the complainant and he must establish that the articulated reason for rejection [termination] is pretext." (*A. P. Green Services Division of Bigelow-Liptak Corp. v. Fair Employment Practices Com.* (1974), 19 Ill. App. 3d 875, 881, 312 N.E.2d 314, 318.) A review of the evidence adduced on this matter reveals that defendant's employer presented ample evidence of proper cause for her termination and that defendant did not establish that the cause was a pretext. Indeed, regarding her lack of work effort, defendant admitted that as of November 1973, other than making phone calls for the FCC license renewal which had been filed in August, she did "mostly nothing" and spent her time "read[ing] the newspaper and magazines with the door open." Defendant at first attempted to explain her lack of work as being the result of not having been given

sufficient assignments. However, Howard Shapiro, president of the station, testified that he gave her assignments, that he only received some superficial investigatory work from her, and that she did not complete them. Defendant's descriptions of what she did on these assignments basically meet with Shapiro's characterization, and she never established that she completed the assignments. We also note that as of June 1973 she admittedly refused any directions to appear on the air, as she had done in the past, until her "situation was resolved." Regarding her attitude, defendant did not refute the testimony of several witnesses who established that numerous complaints were had and made about her difficult, uncaring, and uncooperative attitude. In fact, characterization of her attitude was corroborated somewhat by her admissions that she "read the newspaper and magazines with the door open," went on vacation without giving any prior notification, and refused to appear on the air. Although these and other facts established by the evidence in the record seem to us to be saliently important, they were not even mentioned by the FEPC's hearing examiner in his recommended order. Instead, after finding that plaintiff discriminated against defendant because of her sex, he said regarding the retaliation charge that:

> "The only question remains, 'Did Respondent rectify this [discriminatory] situation after the charge was filed?' The answer is 'No.'* * *
>
> The only way Respondent could have mooted Complainant's first charge would have been to give her the job of Executive Director which was rightfully hers. * * * [T]heir final act of termination capped a course of conduct which was illegal from the time Respondent failed to fulfill its commitment to Complainant and make her their Executive Director."

Pursuant to his erroneous adoption of this standard, the hearing examiner proceeded to totally ignore the evidence which established that plaintiff had cause for terminating defendant's employment. The obvious error of the hearing examiner's reasoning was recognized by the full FEPC which, in issuing its final order, reviewed the record before it and concluded that sufficient facts existed to support a finding of termination not for proper cause but in retaliation. Having closely reviewed the same record, however, we conclude that the trial court correctly held that decision by the FEPC to be clearly against the manifest weight of the evidence. The trial court's decision should therefore be affirmed.

■■■ Defendant's remaining contention is that the record in this case did not adequately provide the trial court with the basis of the FEPC's decision and the trial court therefore erred in failing to remand the case to the FEPC for further proceedings. She points out that in order for judicial review to proceed, the reviewing court "must be given a basis to evaluate

the agency's action" and "know what a decision means before it can determine its correctness." (*Klein v. Fair Employment Practices Com.* (1975), 31 Ill. App. 3d 473, 480, 334 N.E.2d 370, 375.) We note that defendant argues the inadequacy of the record for review after arguing, under her first contention, that the same record adequately supported the FEPC decision. More importantly, her argument on this point is apparently made for the first time in these proceedings on this appeal. Because the record does not show that she ever made an argument or received a ruling on this point in the trial court, she is precluded from raising it for the first time on review. (See *Motorola, Inc. v. Illinois Fair Employment Practices Com.* (1966), 34 Ill. 2d 266, 215 N.E.2d 286; *Ray v. City of Chicago* (1960), 19 Ill. 2d 593, 169 N.E.2d 73.) Moreover, having closely reviewed the record in dealing with defendant's first contention, it appears clear that the trial court was fully able to understand the decision and the FEPC's basis for reaching it. Attached to the FEPC's order were several pages of discussion, several paragraphs of which set forth the evidence in the record which the FEPC relied on in reaching its conclusion. The trial court's review of the record led it to the conclusion, which we share, that the FEPC's decision was against the manifest weight of the evidence. Notwithstanding defendant's dissatisfaction with that result it appears that the record herein provided a more than adequate basis for review. Based on all of the above the judgment of the circuit court reversing the FEPC in part is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.