CLARK OIL & REFINING CORPORATION, Plaintiff-Appellant, *v.* DWIGHT A. GOLDEN *et al.*, Defendants-Appellees.

First District (5th Division)   No. 82—2963

Opinion filed April 22, 1983.

Susan Margaret Vance and Henry C. Krasnow, both of Mandel, Lipton and Stevenson, Ltd., of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Fredric D. Tannenbaum, Assistant Attorney General, of counsel), for appellees.

JUSTICE SULLIVAN delivered the opinion of the court:
This is an appeal from an order of the trial court affirming a deci-

sion of the Illinois Human Rights Commission that plaintiff violated section 3(a) of the Fair Employment Practices Act (Ill. Rev. Stat. 1979, ch. 48, par. 853(a))[1] in that it discriminated against Dwight A. Golden (defendant) on account of his race with respect to his discharge and the terms and conditions of his employment. Plaintiff contends that defendant failed to (a) establish a *prima facie* case of discrimination by showing that at the time he was fired he was a competent employee, and (b) prove that its reason for firing him— poor job performance—was merely a pretext to cover up race discrimination.

Defendant began his employment with plaintiff in November 1973 as a product loader, but was promoted to a number three chemical operator (3 operator) in January 1974 and later to a number two cumene operator (2 operator) in December 1977. As an operator, defendant was responsible for monitoring tanks and pumps used in the refining of oil products to prevent overflow and spillage. He was fired on June 2, 1978, for "reasons including, but not limited to excessive absenteeism, sleeping on the job, and having caused three tank spills in May, 1978." In his charge filed before the Illinois Fair Employment Practices Commission (FEPC), defendant alleged that he was fired because of his race and not because of his work performance.

The FEPC issued a complaint against plaintiff, and at a hearing thereon before an administrative law judge, defendant testified that he was the first and only black employee in the chemical unit of plaintiff's plant in Blue Island, Illinois (the plant). Each shift in the unit was staffed by a number one operator, who monitored the level of chemicals in each tank within the unit from a central location, and three number 2 or 3 operators who supervised 25 to 30 tanks moving chemicals from one to another and monitoring the level of product therein, usually by checking gauges on the outside of each tank. The four operators worked independently, but would help each other. During the 4½ years that he worked as an operator, he caused six spills, for all but one or two of which he was either formally reprimanded or suspended without pay. When he was first promoted to 3 operator, the training was to come mostly from co-workers, but they refused to

---

[1]On July 1, 1980, the Fair Employment Practices Act was superseded by the Illinois Human Rights Act. (Ill. Rev. Stat. 1981, ch. 68, par. 1—101 *et seq.*) The Illinois Human rights Act provides that complaints issued under the Fair Employment Practices Act, as was the complaint in the instant action, shall be assumed by the Illinois Human Rights Commission. (Ill. Rev. Stat. 1981, ch. 68, par. 9—102.) Section 3 of the Fair Employment Practices Act is substantially the same as section 2—102(A) of the Illinois Human Rights Act. Ill. Rev. Stat. 1981, ch. 68, par. 2—102(A).

teach him. He complained about this to his supervisor, Delbert Gibson, who took no action other than to tell him to "keep trying." After two or three weeks of training, Gibson reviewed his work and demoted him to product loader on the basis that he was not qualified for the position of 3 operator. He (defendant) immediately went to Bert Foster, the assistant plant manager, and complained of his inadequate training, which resulted in his demotion. Foster ordered Gibson to personally train him, and Gibson, although angry, spent three days doing so. After his reinstatement as a 3 operator, his co-workers were still hostile and uncooperative, and anonymous letters containing racial slurs and veiled threats appeared on his locker every three or four days. When he complained, Gibson responded that "we can't make a lot of people like you," but promised to try to put a stop to the letters. Gibson placed a note in the daily instruction book ordering a stop to the letters, but did not threaten any disciplinary action. The letters finally stopped four or five months later, but his co-workers still refused to help him, although they assisted each other. He was cited for sleeping on the job, and did have difficulty during the first two years because he was not used to shift work. However, sleeping on the job was common practice among all of the operators, and the foremen would try to avoid catching the others by knocking or making noise before they entered the area, while making an effort to catch him (defendant). He complained about this disparate treatment to Fred Davidson, one of the foremen. His promotion to 2 operator necessitated a change in shift, and he immediately began having problems with Norman Duckworth, the number one operator on the new shift. He complained to Gibson about Duckworth's racial slurs, but his requests for a shift change, made two or three times, were denied. After a confrontation with Duckworth in March 1978, Duckworth began carrying a gun to work, and although he (defendant) reported this to Gibson, no disciplinary action was taken. Spills occurred at the plant every month or two and were generally caused by the negligence of an operator, although co-workers could sabotage one another by opening a valve after it had been set. This happened to him once, but when told of the incident, Gibson took no action. He admitted that he discussed his absenteeism with Gibson and Foster after receiving a letter about it in September or October of 1977; that he spilled acetone, a flammable liquid, in January 1975; that he had three spills in May 1978; that spills can be prevented; that he did not report to the assistant plant manager that Duckworth was carrying a gun; and that he never heard Gibson make any racially derogatory remarks.

Edward Scheutzow testified that he worked for plaintiff from

June 1970 until January 1976. He was first assigned to the chemical unit, where he worked as a truck loader for three months before his promotion to 3 operator. In October 1973, he was transferred to the resin unit. While employed in the chemical unit, he caused the following spills: phenol and crude oil in the fall and winter of 1970; phenol in the summer of 1971; two phenol spills during an eight-hour shift in 1972; acetone in the summer of 1972; and acetone again in the summer of 1973. He had a number of smaller spills which he did not report. He became notorious for spilling, and both his foreman and Gibson knew of the seven spills described; however, his only discipline was being "yelled at," and he never received a written reprimand or a suspension. On one occasion, Gibson personally informed him that a tank in his area was overflowing, but merely commented that given his history of spills, he (Scheutzow) would have to be more careful. On the average, a spill occurred every two months at the plant, but there might be two or three in one week, then none for several months. Sleeping on the job was a common occurrence at the plant, because there was a lot of "dead time"; but, in general, workers were not disciplined for sleeping. He (Scheutzow) was caught and reprimanded for sleeping, but he believed no formal record was made of the incident because he never received a copy of it. The only way an operator can be trained for the job is learning from existing operators. Defendant was commonly called "dumb nigger" by his co-workers. He (Scheutzow) admitted that he did not enjoy working at the plant and was glad to leave, but he left amicably and of his own volition.

Earl Rousseau, director of employee relations at the plant, testified for plaintiff that his position entailed maintaining employee records, but he would have no knowledge of any infractions unless the supervisor chose to report them to him. There was an "affirmative action policy" in effect at the plant which was communicated to supervisory personnel, posted on bulletin boards, and explained to prospective employees. When an infraction occurred, an employee usually received an oral warning the first time, and thereafter a written record was made. He recommended that defendant be fired after reviewing his record. He talked to defendant approximately five times concerning work-related problems, but the derogatory notes and problems with Duckworth were not brought to his attention. He admitted that a supervisor had discretion in notifying him of any infraction; that there were no written policies on termination because of sleeping, spilling, or absenteeism, although a policy that three unexcused absences would result in termination was adopted on April 1, 1978; and that when defendant complained to him in 1974 or 1975 about

discrimination, he (Rousseau) discussed the problem with Gibson, the assistant plant manager, and the plant manager.

Defendant, called as an adverse witness, further testified that he was not disciplined for a spill which occurred on May 9, 1978, but received a three-day suspension for a spill on May 17, 1978. At that time, he was having personal problems and was engaged in a personal telephone conversation when one spill occurred. He left work because of illness on May 4 and May 15, 1978. In December 1977, he spilled caustic solution, and while Gibson recommended a three-day suspension, he was not suspended after he filed a grievance. None of the spills involved finished products, and spills of finished product are more serious because the materials and time involved in manufacture cannot be recovered. His last three spills did not involve flammable material.

Delbert Gibson, chemical unit supervisor at the plant, testified that he was responsible for training and supervising foremen, chemical operators, and other workers within the unit. At a 1974 meeting, the plant manager ordered that everyone be treated equally, regardless of race or sex, and he (Gibson) followed that directive in evaluating employees. Defendant complained to him about receiving racially derogatory notes, and the letters stopped after he (Gibson) wrote a note in the daily instruction book that such behavior was "horseplay, childish, and uncalled for." Defendant did not tell him about Duckworth carrying a gun or complain about co-workers calling him names. When a new operator started, he was first given books to read, then received on-the-job training from the other operators on his shift for two or three weeks. Additional training was received on promotion from 3 operator to 2 operator. He wrote a warning to defendant in regard to his frequent spills, telling him that he had to improve his work, and talked to him several times about his absenteeism. On May 17, 1978, he heard defendant paged several times to check a steam generator, and he (Gibson) went out to look for defendant, at which time he saw a tank overflowing in defendant's area. He could never trust defendant to do what he was supposed to do, and he (defendant) did not seem to want to learn the operation. He (Gibson) rejected defendant after a month, but he was reinstated after complaining, and he (Gibson) spent three full days training him personally. Approximately six spills occur each year at the plant, and a spill of unfinished product is just as serious as a spill of finished product, although a spill of flammable material is more serious. He admitted that the most important training comes from co-workers; that the directive to treat everyone equally was in response to defendant's complaints

about his training; that he did not tell his supervisors about the notes defendant was receiving; that defendant did complain of problems with Duckworth, but he did not recall that it was put in terms of racial harassment; and that he recommended defendant's promotion to 2 operator in December 1977.

The administrative law judge concluded that plaintiff treated defendant differently from white employees in making formal note of his infractions more frequently and in imposing more severe penalties on him for the same or similar offenses; that plaintiff did not take adequate action to reduce or eliminate racial hostility directed at defendant; and that plaintiff discriminated against him on account of race with respect to his discharge and the terms and conditions of his employment. Her findings and conclusions were adopted by the Illinois Human Rights Commission (successor of the FEPC), and the trial court found that its decision was not against the manifest weight of the evidence. This appeal followed.

OPINION

Plaintiff first contends that defendant failed to establish a *prima facie* case of race discrimination. It maintains that defendant did not prove he was a competent employee as required by *Weigel Broadcasting Co. v. Hammer* (1978), 67 Ill. App. 3d 805, 384 N.E.2d 811. Defendant argues that, under the circumstances of this case, he was only required to prove that he was as competent as a similarly situated white employee who was not fired.

■ The board outlines of a *prima facie* case of race discrimination were first articulated in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817, where the plaintiff brought suit under title VII of the Civil Rights Act of 1964 (42 U.S.C. sec. 2000e *et seq.* (1970)), alleging that he was denied employment because he was black. The court held that the complainant under title VII has the burden of showing "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants [*sic*] from persons of complainant's qualifications." (411 U.S. 792, 802, 36 L. Ed. 2d 668, 677, 93 S. Ct. 1817, 1824.) This same standard is applicable to charges brought under the Illinois Fair Employment Practices Act (*Schoneberg v. Grundy County Special Education Cooperative* (1979), 67 Ill. App. 3d 899, 385 N.E.2d 351) and has been adapted, with minor modifications to suit the particular facts and cir-

cumstances, to cases involving failure to promote (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 207, 101 S. Ct. 1089), discharge (*Flowers v. Crouch-Walker Corp.* (7th Cir. 1977), 552 F.2d 1277), and retaliatory discharge (*Weigel Broadcasting Co. v. Hammer* (1978), 67 Ill. App. 3d 805, 384 N.E.2d 811). In each case, the complainant must present evidence that he was qualified for the position in question.

In the instant case, defendant attempted to satisfy the qualification element of his *prima facie* case by comparing his work performance with that of another employee who was not discharged. He presented evidence that Scheutzow caused seven chemical spills during his 3½ years as an operator in the chemical unit, while he (defendant) caused six spills in 4½ years. Both men had been caught sleeping on the job. Defendant did have some difficulty with absenteeism approximately seven months before his discharge, but there is no evidence of Scheutzow's record of absenteeism. However, it appears that this problem of defendant was corrected to plaintiff's satisfaction since no further incidents appear on the record and defendant was thereafter promoted. (Compare *Flowers v. Crouch-Walker Corp.* (7th Cir. 1977), 552 F.2d 1277, 1283 (when unsatisfactory work is corrected and the employer thereafter accepts the complainant's work without express reservation, there is sufficient showing that he was qualified to sustain his *prima facie* case).) Plaintiff does not contend that such comparative evidence is insufficient to establish that an employee is competent; instead, it maintains that Scheutzow's performance is irrelevant because he was a 3 operator, whereas defendant was a 2 operator when the majority of his spills occurred. Thus, resolution of this issue is dependent upon a determination of the similarity between the two positions.

Plaintiff argues that since there are no disputed facts on this issue, the agency's implicit conclusion that the positions are similar and that defendant therefore established a *prima facie* case of discrimination, is a legal conclusion which we must review without deference to the agency's determination. (See *Local 7-641, Oil, Chemical & Atomic Workers International Union v. Department of Labor* (1982), 106 Ill. App. 3d 476, 435 N.E.2d 1192.) However, the cases it cites in support thereof actually favor defendant's position that the agency's decision in this instance was a question of fact which we may not disturb unless it is contrary to the manifest weight of the evidence. (*Board of Education v. Illinois Fair Employment Practices Com.* (1979), 79 Ill. App. 3d 446, 398 N.E.2d 619; *United Air Lines, Inc. v. Illinois Fair Employment Practices Com.* (1979), 69 Ill. App.

3d 519, 387 N.E.2d 875; *Weigel Broadcasting Co. v. Hammer* (1978), 67 Ill. App. 3d 805, 384 N.E.2d 811; *Northern Illinois University v. Fair Employment Practices Com.* (1978), 58 Ill. App. 3d 992, 374 N.E.2d 748. See also *Pullman-Standard v. Swint* (1982), 456 U.S. 273, 72 L. Ed. 2d 66, 102 S. Ct. 1781.) Therefore, we will presume, as we are required to do, that the agency's determination is *prima facie* correct (Ill. Rev. Stat. 1981, ch. 110, par. 3—110; *McHugh v. Civil Service Com.* (1979), 68 Ill. App. 3d 575, 386 N.E.2d 573) and reverse only if the opposite conclusion is clearly evidence (*Cox v. Daley* (1981), 93 Ill. App. 3d 593, 417 N.E.2d 745).

■ Here, there is evidence that 2 and 3 operators had the same responsibilities although they were involved in the manufacture of different chemical products in different, but overlapping, areas in the plant. Gibson, supervisor of both defendant and Scheutzow, testified that "a spill is a spill"; that it is immaterial, in terms of cost, what substance is spilled; and that, when a new employee is trained, he learns his duties from 1, 2, and 3 operators. Plaintiff maintains that since a 2 operator receives some extra training and an unspecified amount of additional money, there must be different standards of performance and care. Contrary to plaintiff's assertion, the evidence does not compel a conclusion that the general duties were different, since the hearing officer might well have concluded that even though some additional pay and training were involved, the positions entailed similar responsibilities. It is not our function to reweigh these factors, only to determine whether a conclusion opposite to that reached by the agency is clearly evident. (*Cartwright v. Illinois Civil Service Com.* (1980), 80 Ill. App. 3d 787, 400 N.E.2d 581.) Furthermore, plaintiff admitted in its final brief submitted to the administrative law judge that these positions are similar. There, it stated that "[s]pillage may be committed by any of the 21 employees or four foremen *who work in jobs similar to that held by [defendant]*." (Emphasis added.) The employees referred to are the 1, 2, and 3 operators and four "spares" under the supervision of Gibson. In the light of plaintiff's own representation in addition to the testimony noted, we do not believe that the agency's conclusion was against the manifest weight of the evidence.

■ Plaintiff next contends that defendant failed to rebut its evidence that he was fired for reasons unrelated to race. It correctly notes that once the complainant satisfies his *prima facie* case, the burden of going forward with the evidence shifts to the employer to show some evidence of a nondiscriminatory reason for the discharge. (*Weigel Broadcasting Co. v. Hammer* (1978), 67 Ill. App. 3d 805, 384

N.E.2d 811.) The burden then shifts back to the complainant to rebut this evidence and prove that the reason advanced is a pretext, and the employer's true motivation was racial discrimination. (*United Air Lines, Inc. v. Illinois Fair Employment Practices Com.* (1979), 69 Ill. App. 3d 519, 387 N.E.2d 875.) Plaintiff asserts that it discharged defendant because he caused three chemical spills in May 1978.[2] It maintains that defendant attempted, but failed, to rebut this evidence by showing (1) that a similarly situated white employee engaged in similar conduct and was not discharged; (2) that his infractions were "written-up" more often and resulted in disciplinary action not imposed upon white co-workers who committed the same infractions; and (3) that plaintiff failed to take adequate action to eliminate racial hostility directed at him.

Turning to the first rebuttal evidence cited by plaintiff, we note that Scheutzow caused seven spills during his employment in the chemical unit of plaintiff's plant, two of them during one eight-hour shift; whereas, defendant caused six spills during his tenure, three of them during the same month. Comparison with a single employee is sufficient to meet defendant's burden of proof (see *McDonald v. Santa Fe Trail Transportation Co.* (1976), 427 U.S. 273, 49 L. Ed. 2d 493, 96 S. Ct. 2574) so long as the conduct engaged in is of comparable seriousness (*McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817). Plaintiff posits that defendant and Scheutzow were not similarly situated, and that defendant's conduct was more serious than Scheutzow's.

We have already addressed plaintiff's first argument and believe that the same reasoning is applicable here. The agency's determination that these employees were similarly situated, whether for purposes of establishing defendant's *prima facie* case or rebutting plaintiff's proffered reason for discharge, is not against the manifest weight of the evidence. The sole remaining question, then, is whether the conduct engaged in by defendant and by Scheutzow was of comparable seriousness. We believe, contrary to plaintiff's assertion, that this is a question of fact rather than of law; therefore, the appropriate standard for review is whether the agency's conclusion is against the manifest weight of the evidence. *Eastman Kodak Co. v. Fair Employ-*

---

[2]In its letter of discharge, and before the Commission, plaintiff advanced as further justification defendant's excessive absenteeism and sleeping on the job. During oral argument, however, it abandoned reliance on these additional factors and argued that its sole reason for discharging defendant was the three spills caused in one month. Therefore, we do not consider those other factors here, although they are noted above in comparing the work performance of defendant and Scheutzow.

*ment Practices Com.* (1981), 86 Ill. 2d 60, 426 N.E.2d 877.

■■ Plaintiff maintains that an employer might rationally conclude that an employee who commits three infractions in one month is worse than an employee who commits two infractions in one day; that the former had a "bad month" while the latter only had a "bad day." There is evidence, however, that plaintiff was not actually motivated by the frequency with which infractions occurred in meting out punishment therefor. In December 1977, before the three spills in question occurred, defendant was involved in a single chemical spill. From the record, it appears to have been his first spill in approximately two years, yet it was only his filing of a grievance which prevented plaintiff from imposing a three-day suspension without pay. When Scheutzow had two spills in a single shift, he was not suspended and no formal reprimand was placed in his personnel file. Surely if plaintiff were imposing punishments in relation to the infractions committed, Scheutzow's conduct on that day merited more severe punishment than defendant received for "lesser conduct," yet Scheutzow's only punishment was being "yelled at" by the foreman. If two spills in one day is not more serious than one in a day, we do not believe that the agency's determination that three in a month is not more serious than two in a day is against the manifest weight of the evidence. In the light of our disposition of this issue, we find it unnecessary to address plaintiff's further arguments with regard to its allegedly disparate record keeping and failure to eliminate or reduce racial hostility directed at defendant.

For the foregoing reasons, the order of the trial court affirming the decision of the Illinois Human Rights Commission is affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.