34 Ill.2d 266 (1966)
215 N.E.2d 286
MOTOROLA, INC., Appellant,
v.
ILLINOIS FAIR EMPLOYMENT PRACTICES COMMISSION et al., Appellees.
No. 39297.
Supreme Court of Illinois.
Opinion filed March 24, 1966.
*267 CHARLES E. GREEN, ROBERT V. NYSTROM, ROBERT E. CRONIN and HOWARD C. GOLDMAN, all of Chicago, for appellant.
WILLIAM G. CLARK, Attorney General, of Springfield, (RICHARD A. MICHAEL, A. ZOLA GROVES, and BERNARD GENIS, Assistant Attorneys General, of counsel,) for appellees.
*268 KATZ & FRIEDMAN, of Chicago, for amicus curiae International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, UAW, AFL-CIO, and Robert Johnston.
JAMES B. O'SHAUGHNESSY, of Chicago, (SCHIFF, HARDIN, WAITE, DORSCHEL & BRITTON, of counsel,) for amicus curiae Illinois State Chamber of Commerce.
Judgment reversed.
Mr. JUSTICE SCHAEFER delivered the opinion of the court:
The Illinois Fair Employment Practices Commission found that the plaintiff, Motorola, Inc., falsely recorded the examination grade of a Negro applicant for employment in order to avoid hiring him. The circuit court of Cook County affirmed the Commission's ruling that the plaintiff had committed an unfair employment practice, and this administrative review action comes here on direct appeal because the plaintiff challenges not only the sufficiency of the evidence, but also the constitutionality of certain provisions of the Fair Employment Practices Act. Ill. Rev. Stat. 1963, chap. 48, pars. 851-66.
On July 15, 1963, Leon Myart, a negro, came to Motorola's Franklin Park plant in response to a newspaper advertisement. He applied for employment there as an "analyzer and phaser," a production-line position which involves the testing and adjusting of television sets. After he completed an application form, the receptionist at the employment office gave him a written, five-minute test, referred to in the record as "General Ability Test No. 10." After he took the test, Myart was interviewed briefly by a company representative. At the conclusion of the interview, the representative told him that the company would "get in touch" with him.
Myart did not receive any communication from the company, and on July 29, 1963, he filed a complaint with *269 the Fair Employment Practices Commission. The complaint alleged that he was qualified for the position of analyzer and phaser, that he had taken and passed the test given to him, and that he believed he was not hired because of the plaintiff's "widely-known" practice of racial discrimination in hiring. A member of the staff of the Commission investigated the charges, and the Commission determined that there existed substantial evidence that Motorola had committed an unfair employment practice. It requested that the parties attend a conciliation conference. Motorola refused to attend unless a court reporter could be present, but the Commission's rules prohibit stenographic reports of conciliation conferences. No conciliation conference was held. On November 22, 1963, the Commission issued a "complaint of unfair employment practice" against Motorola.
The hearing examiner heard conflicting evidence concerning both Myart's qualifications for the position of analyzer and phaser and whether Myart informed Motorola of all of his experience and education. The examiner resolved these issues in favor of Myart. Motorola required a score of six on Test No. 10 as a prerequisite to further consideration of an applicant, and a witness for Motorola testified that he recorded Myart's score of four on his application form. Myart's actual test paper was never produced, however, and the examiner found that if it had been produced, it would have been adverse to Motorola's contention that Myart scored four. Although the issue had neither been raised by the pleadings nor discussed by the parties, the examiner also found that the general ability test did not "lend itself to equal opportunity to qualify for the hitherto culturally deprived and the disadvantaged groups." He cited in support of this conclusion certain books and articles which had not been offered in evidence. The examiner ordered Motorola to cease and desist from denying equal employment opportunity to qualified applicants, to cease using the general ability test, to revise its employment application *270 form, and to offer Myart employment as an analyzer and phaser. Motorola sought review of the examiner's decision before the Commission.
The Commission permitted both sides to present new evidence, much of which was directed to the question whether the general ability test was inherently discriminatory against negroes and other minority groups. Eventually, however, the Commission ruled that this question was not involved in the proceedings before it because Myart had passed the test and because the issue had not been raised by Myart's complaint. The Commission's final decision made the following findings of fact, which are the only findings before us for review:
"1. That the Complainant passed General Ability Test No. 10 on July 15, 1963 when given to him by Respondent.
2. That the Respondent marked the Complainant's application form with a failing score for General Ability Test No. 10.
3. That the intent of the Respondent in incorrectly marking the Complainant's application was to discriminate against Complainant on account of his race.
4. That by reason of this discrimination based on race, the Respondent refused to process further the Complainant's application for employment in the Respondent's hiring procedure."
The Commission ordered Motorola to cease and desist from denying equal employment opportunity to any qualified applicant because of his race and to pay Myart $1,000 "as compensatory damages in elimination of the effect upon the complainant of the practice originally complained of."
The circuit court ruled that the Commission lacked the power to make an award of monetary damages, and the Commission has not appealed from that ruling. Although the court noted that it would not have made the findings that the Commission did had it been the trier of fact, it *271 held that those findings were supported by competent evidence from which reasonable men could draw an inference of discrimination. It therefore affirmed the Commission's findings and its cease-and-desist order.
At the outset we encounter Motorola's contentions that certain provisions of the Fair Employment Practices Act are unconstitutional. The first of these contentions centers upon section 8(h), which provides: "The Commission may, at any time prior to final order of the Court [in a proceeding for judicial review or judicial enforcement of a commission order] upon reasonable notice, modify or set aside in whole or in part, any finding or order made by it except an order or finding that a respondent has not engaged in the unfair employment practice charged in the complaint." (Ill. Rev. Stat. 1963, chap. 48, par. 858(h).) The decisions of the Commission are reviewable under the Administrative Review Act which defines an "administrative decision" as a ruling "which terminates the proceedings before the administrative agency." (Ill. Rev. Stat. 1963, chap. 110, par. 264.) Reading these two statutory provisions together, Motorola contends that "the existence of section 8(h) of the Act prevents a final appealable order and hence invalidates the proceeding before the Commission." The argument is that an impasse has been created: "the legislature grants the right to appeal and at the same time prevents a final and appealable decision."
Although Motorola contends that this impasse deprives it of due process of law, the problem raised is primarily one of statutory construction, and the statutory definition of an "administrative decision," upon which Motorola's argument rests, is not complete. Section I of the Administrative Review Act, in addition to the definition that Motorola relies upon, provides: "[I]f the particular statute permits an application for rehearing or other method of administrative review to be filed with the administrative agency for an indefinite period of time after the administrative decision *272 has been rendered (such as permitting such application to be filed at any time before judgment by the administrative agency against the applicant or within a specified time after the entry of such judgment), then the authorization for the filing of such application for rehearing or review shall not postpone the time when the administrative decision as to which such application shall be filed would otherwise become final, but the filing of the application for rehearing or review with the administrative agency in this type of case shall constitute the commencement of a new proceeding before such agency, and the decision rendered in order to dispose of such rehearing or other review proceeding shall constitute a new and independent administrative decision." Ill. Rev. Stat. 1963, chap. 110, par. 264.
It is true that this provision of the statute refers only to those changes in administrative decisions that are responsive to the application of a party, and that a modification upon the administrative agency's own motion, as authorized by section 8(h), is not expressly mentioned. But this provision expresses the legislative purpose that judicial review is not to be barred by the power of an administrative agency to reconsider its decision after judicial review has been initiated. Modification upon the agency's own motion presents the same problem as modification upon a rehearing sought by a party, and we see no reason why the same legislative policy and procedure should not govern such a modification.
There are two respects in which the procedure contemplated by section 8(h) of the Fair Employment Practices Act and section I of the Administrative Review Act may not have been complied with, but we think that neither presents a serious problem in this case. Section 8(h) contemplates that a modification may be made "upon reasonable notice." Motorola did not present any objection based upon defective notice to the circuit court, and it may not raise this issue for the first time on appeal. (See Ray v. City of *273 Chicago, 19 Ill.2d 593, 602.) To the extent that such a defect might be regarded as jurisdictional, it would relate to jurisdiction of the person rather than of the subject matter, and a challenge to jurisdiction over the person is waived unless it is raised at the earliest opportunity. Cf. Traders Mutual Life Insurance Co. v. Humphrey, 207 Ill. 540.
No new administrative action was commenced after the modification of the Commission's decision, as is contemplated by the procedure established in section I of the Administrative Review Act. The modified decision of the agency was, however, challenged in an amended complaint filed by Motorola. That decision was put before the circuit court in the record filed by the administrative agency as its answer. It was reviewed by the circuit court, and no useful purpose would be served by requiring at this time the institution of a new administrative review proceeding.
One constitutional issue that might otherwise have arisen because of the lack of complete finality of the administrative decision is met by section 9 of article VI of the constitution which provides that the circuit court shall have "such powers of review of administrative action as may be provided by law." Another constitutional issue might arise if section 8(h) of the Fair Employment Practices Act were construed to permit modification of the Commission's decision after the circuit court had rendered its decision in the administrative review action. But there is no basis for such a construction, for when section 8(h) is read in conjunction with section 13 of the Administrative Review Act, (Ill. Rev. Stat. 1963, chap. 48, par. 858(h); chap. 110, par. 276,) it is apparent that "the final order of the Court" referred to in section 8(h) must mean the final order of the circuit court. It is only such a final order that may be considered by the appellate court or this court under the Administrative Review Act.
Motorola also challenges the validity of the provision of section 8 (f) which allows the Commission's hearing examiners *274 to issue cease-and-desist orders and "to take such further affirmative or other actions with respect to the complainant as will eliminate the effect of the practice originally complained of." (Ill. Rev. Stat. 1963, chap. 48, par. 858(f).) The contention advanced is that this delegation of power to the hearing examiners is unconstitutional because the statute does not give like powers to the Commission. In response to this contention it is not necessary to set out the numerous provisions which make it plain that the power delegated by the statute rests with the Commission rather than with its hearing examiners or its individual members. It is sufficient to refer to section 8(g) (I) of the act, which provides: "The decision of the commissioner or hearing examiner shall be filed with the Commission. Unless a petition for review is filed by either party * * * the decision shall become the decision of the Commission if it shall be supported by substantial evidence." (Ill. Rev. Stat. 1963, chap. 48, par. 858(g)(I.) The statute thus clearly provides that no decision of a hearing examiner or a commissioner is to become the decision of the Commission unless it has been found by the Commission to be supported by substantial evidence.
The Commission concluded its hearings in this case on July 15, 1964, and it rendered its first decision on November 18, 1964. The claim that this delay in issuing the decision deprived Motorola of its constitutional and statutory right to a prompt ruling is insubstantial.
We come now to a consideration of the evidence in this case. Deference is unquestionably due the factual determinations of an agency charged with the primary responsibility for adjudication in a specialized area. (See, e.g., Kellogg Switchboard and Supply Corp. v. Department of Revenue, 14 Ill.2d 434, 439.) The wisdom of this principle of judicial review is emphasized when the agency's area of competence involves the subtleties of conduct often present in cases of racial discrimination. As the New York Court *275 of Appeals observed, "One intent on violating the Law Against Discrimination cannot be expected to declare or announce his purpose. Far more likely is it that he will pursue his discriminatory practices in ways that are devious, by methods subtle and elusive * * *." (Holland v. Edwards, (1954) 307 N.Y. 38, 119 N.E.2d 581.) We agree with the circuit court that the Commission must be allowed reasonable latitude in drawing inferences of discrimination from competent circumstantial evidence.
The Commission's findings in this case, however, make the decisive issue not one of motive but one of fact. If Motorola falsely recorded Myart's test score, that action would leave little doubt that an unfair employment practice had been committed. Conversely, if Myart failed the test, the record would not establish an unfair employment practice with respect to him. He would have been refused employment for a reason applicable to all who fared as he did on the examination. The possibility that he might have become a victim of discrimination at a later stage in the hiring process would not, in that circumstance, be significant. The parties have vigorously disputed whether Myart possessed the technical knowledge to be an analyzer and phaser, whether he fully stated his training and experience to his interviewer, and whether his previous conduct in other jobs and in the armed services would have disqualified him from employment. But under the Commission's findings those issues are relevant only to a determination of the proper remedy for an unfair employment practice committed at a preliminary stage of the hiring process. Whether such an unfair practice was in fact committed depends on whether Myart passed the test. We therefore turn to the evidence that led the Commission to its findings on that issue.
The Commission's order recites that evidence was introduced which showed that at the time Myart applied for employment, negroes were excluded from consideration for *276 the position that he sought. There is no direct testimony in the record on this question. The Commission apparently relied for its statement upon inferences drawn from the testimony of Walter J. Ducey, Executive Director of the Commission, as to a conversation with an officer of Motorola, and upon portions of the testimony of Motorola's personnel director. Although other inferences could have been drawn, it was possible to infer from this testimony that at the time of Myart's application, Motorola was not hiring negroes in production line jobs in that part of its work which involved production for civilian consumption, and that the first two negroes to be employed as analyzers and phasers were hired during the week before the hearing commenced. The Commission apparently drew these inferences. While a background of prior discrimination could be taken into account in appraising other evidence, it was not, in itself, sufficient to justify the findings of the Commission.
The key finding of the Commission is that Myart passed test No. 10, but that Motorola marked his application form with a failing score in order to discriminate against him on account of his race. In addition to the evidence of prior discrimination relied upon by the Commission, this finding is based upon the fact that on two occasions, once before and once after he took the test at Motorola, Myart had passed the test, and upon the adverse inference which the Commission drew from Motorola's failure to produce the actual test taken by Myart.
Walter J. Ducey testified that on September 19, 1963, he gave Myart the same examination that he had taken at Motorola in July, and that Myart scored seven. Motorola's counsel had previously attempted to question Myart about the circumstances under which he had taken this examination; but objections to these questions were repeatedly sustained. In explaining his rulings, the examiner stated that the test at Motorola was the only one at issue, and that what had transpired between Myart and Ducey was irrelevant. *277 Nonetheless, both the decision of the hearing examiner and the decision of the Commission relied upon the fact that Myart had passed the test given by Ducey as evidence that he had passed at Motorola.
On cross-examination before the hearing examiner, Myart testified that he had never taken the general ability test before he took it at Motorola in July, 1963. He was asked specifically whether he had taken the test when he successfully sought employment at Montgomery Ward in October, 1962, and he replied that he had not. No further evidence was introduced on this question before the hearing examiner. Before the Commission, the Personnel Services Manager of Montgomery Ward testified that the records of Montgomery Ward showed that Myart had taken the test there on October 2, 1962, and that he had scored six. The Commission cited this fact as further evidence that Myart passed the test at Motorola.
While a sufficient demonstration of Myart's ability to pass the test would be admissible as tending to show that he had in fact passed it, expert testimony in this case, coupled with the examiner's refusal to admit evidence as to the circumstances under which the last test was taken, minimizes the probative worth of the evidence on which the Commission relied. Dr. Phillip A. Shurrager, Chairman of the Psychology and Education Department at the Illinois Institute of Technology, testified that he and his wife developed the general ability examination that Myart took. He said that when the test was given to applicants for industrial positions, the mean score was eight; he added that 68 per cent of the population would pass the test when a score of six was required. He further testified that a person would ordinarily improve his score on successive examinations and that a person who had scored a four initially might be expected to score two or three points higher when he took the test again. This testimony was not contradicted, nor could it be considered contrary to the ordinary expectations *278 of fact-finders who were not experts in psychology. If this testimony was correct, Myart's performance on the examination given by Ducey was at least as consistent with the contention that he had failed the examination at Motorola as with the contention that he had passed.
Because of the tendency to improve on successive examinations, Myart's performance on the examination at Montgomery Ward might initially seem more significant than his performance on the third examination that he took. Again, however, expert testimony casts doubt on the significance of Myart's passing score. Benjamin S. Bloom, Professor of Education at the University of Chicago, was called by Myart as a witness before the Commission. He testified on direct examination, "This is * * * one of the shortest aptitude tests in the field. * * * If you repeated this test several times there would be considerable variation from time to time, and much depends upon the accidents of circumstances." Variation within a range of two or three points on even a short examination would hardly seem improbable to a reasonable, nonexpert factfinder. This expert testimony indicated that Myart's performance on the other examinations was not inconsistent with his allegedly unsatisfactory performance at Motorola.
Another expert, Robert L. French, of Science Research Associates, was called by Myart before the Commission. He testified that while he would not attempt to predict with certainty what any individual might do, he found it difficult to understand that a person with Myart's background could not score six points on the test. In view of the fact that Myart at no time scored better than seven points, French's testimony does not go far toward establishing that Myart passed the test at Motorola.
The actual test taken by Myart was not introduced in evidence. The only requests to Motorola for documents, however, were in the form of letters from the Commission. The first of these letters, dated August 2, 1963, described *279 the charge made against Motorola and stated that the Commission's executive director would come to Motorola's office to investigate. It concluded, "Will you kindly have available someone from your office with knowledge of the facts to meet with Mr. Ducey. Please have all records concerning said charge available for his review." Subsequent letters to the plaintiff and its attorney requested "copies of the application forms and test scores of those persons hired as analyzers and phasers by the company during the months of July and August for 1963." At no time during the investigation of the charge or at the hearing before the examiner did either Myart or the Commission specifically request that Myart's examination paper be produced.
The hearing examiner said in his decision: "In the absence of the test which Complainant took, his answers thereto, and the overlay key for checking the Complainant's answers, the Hearing Examiner is denied sufficient means for holding with the Respondent that Complainant was accorded equal opportunity with all other applicants without regard to the Complainant's race. All of the above mentioned items were at one time, at least, in the possession and under the control of the Respondent; and its failure to produce, after the exercise of reasonable diligence, or its failure sufficiently to explain away its inability to produce, if that were the fact, does not convince the Hearing Examiner of any eagerness on the Respondent's part to disclose all of the facts in this case."
At the hearing before the Commission Motorola introduced evidence to show what had happened to Myart's test paper. Jerry Hoelscher, an employment interviewer, had testified before the hearing examiner that he had conducted Myart's interview, and that he transposed Myart's score of four from the test paper onto his application form at the time of the interview. Hoelscher testified that every applicant was interviewed, whether he passed or failed the test. The reason for this procedure, as Motorola's Personnel *280 Director later testified, was that job applicants are potential customers and deserve the courtesy of a personal interview.
At the hearing before the Commission, Motorola called Suzanne LaBuda, a receptionist at its Franklin Park employment office. She testified that she was working as a receptionist on the day Myart applied, and she described in detail the manner in which she administered and graded the applicants' general ability tests. She said that after grading the examinations she attached them to the application forms and left them for the employment interviewer. On cross-examination, she testified that the examination papers were retained at the Franklin Park plant for two months and then sent to the Personnel Testing Center.
After Miss LaBuda's testimony, the plaintiff called Raymond A. Orth, Manager of the Personnel Testing Center. He testified that when examination papers are received at the testing center they are checked to determine whether they were properly graded. The scores are then recorded on a score sheet, which is sent to the Data Processing Center. The test papers themselves are destroyed, because 20,000 applicants take the test every year and Motorola does not have the space to store that number of examinations.
Robert Brauch, Motorola's Manager of Data Processing, testified that the information contained on the score sheet that his department receives from the testing center is recorded on IBM cards. He produced the card on which Leon Myart's score was recorded, and it was introduced in evidence. Brauch testified that the score that appeared there, in the form of holes punched in the card, was four.
It appears from this testimony that Myart's test paper was destroyed about two months after he applied for employment. When it was destroyed, Motorola was not a party to any formal proceedings, but it had notice that Myart's complaint had been filed and was under investigation by the Commission. The destruction of the test under *281 these circumstances could reasonably be considered by the Commission as evidence adverse to Motorola's contention that Myart had failed to pass the test. (See, e.g., Butler v. O'Brien, 8 Ill.2d 203, 214.) But the possibility remained that the test might have been destroyed innocently. It is not improbable that the person assigned by Motorola to investigate Myart's complaint, after finding what he considered competent evidence of Myart's score, failed to realize that the examination paper itself was of special significance. Neither the test Myart took at Montgomery Ward nor the test he took under Ducey's supervision was ever offered in evidence.
There are other relevant considerations. If Myart's test score was falsely recorded because he was a negro, at least two of the plaintiffs' employees must have participated in that dishonest act. Either the receptionist or the employment interviewer would have recorded the false score that appeared on the application form, and someone in either the Personnel Testing Center or the Data Processing Center would, after the re-grading of the test, have caused the same dishonest score to appear on an IBM card. These employees were not cross-examined concerning their attitude toward negroes, the company's hiring policies, or the instructions they had received from their superiors. The evidence concerning the alleged background of discrimination at Motorola came from the Personnel Director and from the Vice-President in Charge of Human Relations. Thus, if Myart's score was falsely recorded, that action seems to have been the product of an extensive conspiracy within the plaintiff's organization.
The advantage of implementing a policy of discrimination by conspiring to grade examinations falsely is that a company is able to present what seems to be objective evidence of an applicant's disqualification and thereby avoid an inquiry into its good faith. A disadvantage is that the practice is likely to be exposed whenever a receptionist, *282 employment interviewer, worker in the testing center, or data processing technician becomes disaffected with his employer. The practice could also be exposed if an outsider who possesses the general ability test becomes suspicious enough to introduce a negro applicant primed to answer the requisite number of questions correctly. When all the evidence in this case is considered, some suspicion might reasonably remain that the plaintiff had falsely recorded Myart's test score. Under the Fair Employment Practices Act, however, that suspicion is not enough. The act provides that "A determination sustaining a complaint shall be based upon a preponderance of the evidence." (Ill. Rev. Stat. 1963, chap. 48, par. 858(f).) On the record in this case, we are of the opinion that the alleged unfair employment practice was not established by a preponderance of the evidence. The judgment of the circuit court of Cook County is therefore reversed.
Judgment reversed.