(No. 51152.—

VILLAGE OF RIVERWOODS *et al.*, Appellants, v. DEPARTMENT OF TRANSPORTATION *et al.*, Appellees.

*Opinion filed October 2, 1979.*

Berle L. Schwartz, of Highland Park, for appellant Village of Riverwoods.

Berle L. Schwartz and Thomas H. Compere, of Highland Park, for appellant City of Highland Park.

Ronald M. Glink, of Ancel, Glink, Diamond & Murphy, P.C., of Chicago, for appellant Villages of Lincolnwood, Maywood, and Bridgeview.

Sydney G. Craig and Thomas H. Donohoe, of Martin, Craig, Chester & Sonnenschein, of Chicago, Alan R. Johnston, Village Attorney, of Kenilworth, and Jenner & Block, of Chicago, for appellant Villages of Kenilworth, Glencoe, and Winnetka.

Michael Schneiderman and Michael M. Conway, of Hopkins, Sutter, Mulroy, Davis & Cromartie, of Chicago, for appellant Village of Lincolnshire.

Jack M. Siegel, Corporation Counsel, of Chicago, for appellant City of Evanston.

Rosing & Carlson, Ltd., of Waukegan (William G. Rosing and Stephen G. Applehans, of counsel), for appellant City of North Chicago.

William J. Scott, Attorney General, of Springfield (George W. Wolff, Anne K. Markey, and Joyce Alexander McMagny, Assistant Attorneys General, of Chicago, of counsel), for appellee Department of Transportation.

Clifford L. Weaver and David T. Hejna, of Ross, Hardies, O'Keefe, Babcock & Parsons, of Chicago, for appellees Des Plaines-Mount Prospect-Arlington Heights-Palatine Water Commission *et al.*

Schiff, Hardin & Waite, of Chicago (Guenther M. Philipp, Elwood T. Olsen, Janet Rae Montgomery, and

William G. Southard, of counsel), for appellee Village of Downers Grove.

Donald M. Rose, City Attorney, and Kathleen Ross, of Chicago (Moriarty, Rose & Hultquist, Ltd., of counsel), for appellee City of Rolling Meadows.

MR. JUSTICE WARD delivered the opinion of the court:

The appellants here are 11 of some 195 municipalities and other governmental entities in northeastern Illinois which applied to the Department of Transportation for initial allocations of water to be diverted from Lake Michigan under "An Act in relation to the regulation and maintenance of the levels in Lake Michigan ***" (Ill. Rev. Stat. 1977, ch. 19, pars. 119 through 120.11) (the Act). Evidentiary hearings were held before the Department during 1975 and 1976 in a proceeding captioned "In the Matter of Lake Michigan Water Allocation" that resulted in Order LMO 77—1, issued April 15, 1977, in which the Department awarded each appellant less than the full amount of water requested by it. After considering petitions for rehearing, the Department altered some allocations, but Order LMO 77—1 was adhered to in all respects material to this appeal by Order LMO 77—2, which was issued September 26, 1977.

Pursuant to section 12 of the Act (Ill. Rev. Stat. 1977, ch. 19, par. 120.10), complaints for administrative review were filed in the circuit court of Lake County by the appellants and by other applicants. The circuit court set aside a portion of Order LMO 77—2 which reduced the allotment to the village of Glencoe below the amount which had previously been allocated by LMO 77—1, but in all other respects the court affirmed the orders of the Department. An appeal to this court was allowed under Rule 302(b). 58 Ill. 2d R. 302(b).

The appellants here are the villages of Riverwoods, Kenilworth, Glencoe, Winnetka, Lincolnwood, Maywood,

Bridgeview and Lincolnshire and the cities of Evanston, North Chicago, and Highland Park. While these appeals were pending the city of Evanston advised us that the Department had modified its order so as to increase Evanston's allocation, and that Evanston therefore would not participate further in this appeal. The city of Rolling Meadows and the village of Downers Grove urge affirmance of the judgment below, as does the Des Plaines-Mount Prospect-Arlington Heights-Palatine Water Commission and its member municipalities.

The matter before us had its immediate origin in the decree entered by the Supreme Court of the United States in *Wisconsin v. Illinois* (1967), 388 U.S. 426, 18 L. Ed. 2d 1290, 87 S. Ct. 1774, which enjoined the State of Illinois and its municipalities and political subdivisions from diverting water into the Illinois waterway from Lake Michigan, or its watershed, in excess of an annual average of 3,200 cubic feet per second (abbreviated hereafter as cfs). The diversion prohibited by the decree was broadly defined to include diversion "by way of domestic pumpage from the lake the sewage effluent derived from which reaches the Illinois waterway, or by way of storm runoff from the Lake Michigan watershed which is diverted into the Sanitary and Ship Canal, or by way of direct diversion from the Lake into the canal ***."

The decree also provided that the total amount of water which might be diverted "may be apportioned by the State of Illinois among its municipalities, political subdivisions, agencies, and instrumentalities for domestic use or for direct diversion into the Sanitary and Ship Canal to maintain it in a reasonably satisfactory sanitary condition, in such manner and amounts and by and through such instrumentalities as the State may deem proper, subject to any regulations imposed by Congress in the interests of navigation or pollution control." 388 U.S. 426, 427-28, 18 L. Ed. 2d 1290, 1291, 87 S. Ct. 1774, 1775.

Federal limitations on the amount of water which

Illinois could remove from Lake Michigan had existed prior to 1967. See *Sanitary District v. United States* (1925), 266 U.S. 405, 69 L. Ed. 352, 45 S. Ct. 176; *Wisconsin v. Illinois* (1929), 278 U.S. 367, 73 L. Ed. 426, 49 S. Ct. 163; *Wisconsin v. Illinois* (1930), 281 U.S. 179, 74 L. Ed. 799, 50 S. Ct. 266; *Wisconsin v. Illinois* (1930), 281 U.S. 696, 74 L. Ed. 1123, 50 S. Ct. 331; Feldman, *The Lake Diversion Case—The End of a Cycle,* 49 Chi. Bar Rec. 270 (1968).

State legislation relating to the level of Lake Michigan was enacted as early as 1929 in an act providing for cooperation with the Federal government in the maintenance of the level of the lake (1929 Ill. Laws 101). That legislation presumably came in response to the decision of the United States Supreme Court in the *Sanitary District* case mentioned above. So far as we are advised, however, no provision was made for the apportionment of the amount of water to which the State was entitled until an amendment to the act made in 1969 (Pub. Act 76—1844, 1969 Ill. Laws 4071). A further amendment effective in 1972 (Pub. Act 77—163, 1971 Ill. Laws 333) designated the Department as the agency to administer the apportionment.

In its memorandum opinion the circuit court notes that in 1972, prior to the present allocation hearings, the Department had entered an allocation order which had been set aside by the court because of procedural defects. No reference to that earlier proceeding or its effect, if any, on the case now before us is made by the parties, and we do not consider it here.

We turn first to a contention made by several municipalities which abut on Lake Michigan that the Act violates the due process clauses of the Federal and Illinois constitutions, since it accords no priority to riparian and prescriptive rights which they allegedly possess as to water from Lake Michigan.

We entertain some question whether common law

riparian or prescriptive rights include a right to the diversion, as distinguished from the use, of the waters of Lake Michigan, as that term is defined in the decree in *Wisconsin v. Illinois* (1967), 388 U.S. 426, 18 L. Ed. 2d 1290, 87 S. Ct. 1774, or whether such rights may override the paramount interest of the State. The decree itself contains no language requiring Illinois to grant a preferential position to governmental entities claiming such rights. We think it unnecessary to examine further the extent of the rights asserted by these appellants, however, for our decisions in *Supervisors v. Village of Rainbow Gardens* (1958), 14 Ill. 2d 504, 507-08, and *Meador v. City of Salem* (1972), 51 Ill. 2d 572, 578, establish that a municipal corporation is not entitled to the protection of the due process clause against the State.

The cities of Highland Park and North Chicago and the villages of Riverwoods and Lincolnshire challenge the Department's orders on the ground that the Act fails to provide adequate standards to guide the Department, and that the General Assembly has thus made an improper delegation of its legislative power.

The relevant portion of the Act is section 5 (Ill. Rev. Stat. 1977, ch. 19, par. 120.3), which provides as follows:

> "Regional organizations, municipalities, political subdivisions, agencies or instrumentalities, and any other organization, association or individual desiring use water from Lake Michigan and subject to allocation under this Act shall make application to the Department of Transportation on forms provided by such agency which shall include a statement or finding relative to other sources of water or lack thereof within the area, the need for such allocation or apportionment of Lake Michigan water, the purpose or use to be made of the water so allocated, the point of diversion and the location of discharge after use, together with the route such discharge will follow to reach an identifiable, main drain or stream, and whether such water will in any manner be treated or otherwise altered or changed prior to discharge and release from

control by the applicant.

The Department in determining each allocation of water under this Act shall consider the water requirements of the Northeastern Illinois Metropolitan Region (specifically the counties of Cook, DuPage, Kane, Lake, McHenry and Will); the Department shall be guided by *population, business and economic projections and requirements.* The Department shall require that all feasible means reasonably available to the State and its municipalities, political subdivisions, agencies and instrumentalities have been employed to conserve and manage the water resources of the region and the use of water therein in accordance with the best modern scientific knowledge and engineering practice." (Emphasis added.)

As directed by the legislature in section 9 of the Act (Ill. Rev. Stat. 1977, ch. 19, par. 120.7), the Department prescribed and published Rules and Regulations Regarding Allocation of Water From Lake Michigan. It is unnecessary for present purposes to set them out in full, but it may be said that they specify in some detail the factors governing apportionment. Thus Rule 303 divides water users into two categories, those "whose primary water uses are residential, commercial or industrial," and those "whose primary water uses are sewage dilution, pollution abatement or navigation." Applicants falling into the second category are in general given a lower priority than those falling in the first. The first category is subdivided into four classes. The first includes each applicant having "neither a developed or potential source of water supply other than Lake Michigan." Class two includes each applicant "whose developed and potential water resources other than Lake Michigan are insufficient to meet its needs." Class three includes each applicant "whose undeveloped water resources other than Lake Michigan are potentially capable of meeting its needs, but whose developed water resources are insufficient." Within class four falls each applicant "whose developed water resources other than Lake Michigan are sufficient to meet its needs."

Each class is to receive a full allocation of its water needs before any water is allocated to applicants in higher-numbered classes.

Rule 304 deals with the determination of anticipated water needs for each applicant. Basically it provides for consideration of "the population of the area to be served, projected population growth, current and projected per capita consumption within the area, [and] the nature and extent of industrial uses ***."

The contention now under discussion is not that the rules issued by the Department by which allocations were given the appellants are irrelevant to the declared purposes of the Act, nor is it that the allocations were not made pursuant to those rules. The argument is rather that the Act provides no standards at all. Thus, for example, the city of Highland Park, referring to the directive in section 5 that the Department shall be guided by population, business and economic projections and requirements, comments in its brief: "Every community has 'population, business and economic projections and requirements.' How is the Department to rank these criteria, and on what basis is it to prioritize applicants?"

It is a fair reading of section 5 taken as a whole, however, that in making its apportionment the Department is to consider the water requirements of each applicant, and is to do so in the light of its population, both present and projected, of the alternative sources of water available to it, and of its practices in conserving its use of water. We do not believe that, under the unusual circumstances giving rise to this legislation, the General Assembly was required to specify the amount of water to be awarded each applicant or provide a rigid formula from which that amount could be calculated, nor yet to attempt a ranking of priorities among the many different factors which necessarily enter into the allocation process. While we recognize that there is no onus upon the appellants to

draft a model apportionment act, we nevertheless find it significant that none of them is prepared to specify what form of statute would meet their criticism and also deal with the problem of apportionment in a workable manner.

The General Assembly did not have an unlimited option to pick and choose among patterns of allocation, since the total amount of water which could be diverted had already been fixed by the 1967 Supreme Court decree (*Wisconsin v. Illinois* (1967), 388 U.S. 426, 18 L. Ed. 2d 1290, 87 S. Ct. 1774), and since there existed no established system for allocating water in Illinois, unlike many other States. See Plager & Maloney, *Emerging Patterns for Regulation of Consumptive Use of Water in the Eastern United States,* 43 Ind. L.J. 383 (1968); Oeltjen & Fischer, *Allocation of Rights to Water: Preference, Priorities, and the Role of the Market,* 57 Neb. L. Rev. 245 (1978).

It should be noted that the apportionments made in this case are not unalterable. The initial allocation of water which is under review covers the period from 1977 to 1981. In the latter year the permit of each applicant will expire. While under the Department's rules a permit would customarily be renewed in the same amount, a permittee may make a motion to have its permit modified by increasing the amount. Rule 308 provides that a basis for modification is "[e]vidence of a substantial change in circumstances which result in a change in water needs of the permittee." Rule 310, moreover, provides that a permittee may make such a motion *at any time,* and the rule provides further, "If the Department finds that any such petition is supported by an adequate statement of reasons, is not plainly devoid of merit and does not deal with a subject on which a hearing has been held within the preceeding six months, a hearing shall be held." The denial of a permittee's motion would be reviewable under the provisions of the Administrative Review Act (Ill. Rev. Stat.

1977, ch. 110, par. 264 *et seq.*) as are other orders of the Department.

Those appellants that advance the thesis that the Act is invalid because of improper delegation of power cite, but without extended discussion, the decisions in *R. G. Lydy, Inc. v. City of Chicago* (1934), 356 Ill. 230, *Krebs v. Thompson* (1944), 387 Ill. 471, *City of Kankakee v. New York Central R.R. Co.* (1944), 387 Ill. 109, *People ex rel. Chicago Dryer Co. v. City of Chicago* (1952), 413 Ill. 315, *Hoogasian v. Regional Transportation Authority* (1974), 58 Ill. 2d 117, and *Village of Lombard v. Pollution Control Board* (1977), 66 Ill. 2d 503. None of these cases presents a situation comparable to the unusual one involved here, and some of them are readily distinguishable, such as the *Lydy* and *City of Kankakee* cases, where the lack of any judicial review of the administrative action was a factor, and *Dryer,* which related to the delegation of legislative power to private persons.

*Village of Lombard v. Pollution Control Board* is closer to the mark in that it concerned comprehensive, systematic regulation by a specialized agency, but the defect found there was not a lack of standards in the statute, but rather the absence from the statutory standards of authorization for the particular regulation in question.

More pertinent is *Hill v. Relyea* (1966), 34 Ill. 2d 552, cited by the circuit court in its rejection of the claim of improper delegation. That case involved a Mental Health Code provision authorizing the director of a hospital to grant a discharge to one hospitalized for mental treatment "as the welfare of such person and of the community may require, under such rules and regulations as may be adopted by the Department." (Ill. Rev. Stat. 1963, ch. 91½, par. 10–6.) This court reversed a decision of the trial court that this standard was so general as to be an invalid delegation of legislative power. In that connection this

court pointed out:

"The difficulty in attempting to establish more precise legislative standards is readily apparent. The superintendent of the hospital and his staff examine, work with and treat the hospitalized person. They can determine more understandingly and advantageously when the welfare of the person and of the community may require a discharge or continued hospitalization of such person. Therefore it is desirable to grant to the superintendent and the Department the authority to discharge hospitalized persons and the discretion as to when the welfare of such person requires it. The nature of the objectives to be achieved and the problems to be solved negate the usefulness of setting more precise legislative standards." (34 Ill. 2d 552, 556.)

The standard upheld as sufficient in *Hill* was far more vague and subjective than that contained in the present Act, and the objectives to be achieved and the problems to be solved here far exceed those of *Hill* in magnitude, intricacy, and urgency.

The viability of some of the cases cited by the appellants is also cast in doubt by our recent decisions in *Stofer v. Motor Vehicle Casualty Co.* (1977), 68 Ill. 2d 361, and *Thygesen v. Callahan* (1979), 74 Ill. 2d 404. In the former, the court reappraised the constitutional limitations upon rule-making under a comprehensive regulatory statute. It concluded that the boundary between those rights and duties which may be prescribed by regulation and those which must be prescribed by statute could no longer be drawn in terms of a supposed distinction between an "administrative act" and a "legislative act," as some past decisions had supposed. (68 Ill. 2d at 369-70.) The proper criterion was rather whether the statute sufficiently identified "(1) [t]he *persons* and

*activities* potentially subject to regulation; (2) the *harm* sought to be prevented; and (3) the general *means* intended to be available to the administrator to prevent the identified harm." (Emphasis in original.) 68 Ill. 2d 361, 372.

*Thygesen* echoed the concern displayed in *Stofer* over the "inconsistent application of the principle that standards or guidelines must accompany legislative delegations of power" (74 Ill. 2d 404, 408) and endorsed the three-prong formula put forward in *Stofer.*

Although the regulatory rule-making involved in both *Stofer* and *Thygesen* differs from the rationing system mandated by the present act, we do not believe that the test proposed in those cases becomes irrelevant. Here there is no difficulty in identifying either the persons subject to regulation or the harm sought to be prevented, and the primary means to be employed by the Department is also plain. Judged by that test, the Act certainly satisfies constitutional requirements as to delegation of authority.

In addition to making the general challenges to the validity of the Act discussed above, the appellants object to various specific findings on which the allocations made in their individual cases were based. These particularized objections go mainly to the weight of the evidence, particularly in regard to estimates of future population and water requirements. The administrative hearings below lasted 1½ years, and the transcript of proceedings fills some 10,000 pages, excluding exhibits. The trial court reached its decision upon a review of that evidence under the usual standards of review, and with the proper deference due "the factual determinations of an agency charged with the primary responsibility for adjudication in a specialized area." (*Motorola, Inc. v. Illinois Fair Employment Practices Com.* (1966), 34 Ill. 2d 266, 274.) The multiplicity of the appellants' objections, the fact that their relevance is largely confined to the circumstances of

these particular allocations, and the availability of future modification at the administrative level make it unnecessary to discuss each objection, and no more than the comments which follow seem called for.

The village of Riverwoods, which received no allocation of water under either LMO 77—1 or LMO 77—2, objects that the evidence clearly established that this appellant had no adequate alternative source of water than Lake Michigan. The Department correctly points out, however, that subsequent to the issuance of order LMO 77—2, Riverwoods was given an emergency allocation under Rule 305. The latter, for each of the four years involved, equaled or exceeded the amount requested by the appellant.

The city of North Chicago and the village of Lincolnshire object to the Department's use of a maximum rather than an average figure to calculate the amount of water to be set aside for storm-water runoff.

As explained in LMO 77—1, storm-water runoff is water originating by precipitation in the Lake Michigan watershed which, as the result of the reversal of the flow of the Chicago River in 1900, no longer flows into the lake but drains landward and ultimately into the Mississippi River Basin. Under the decree, storm-water runoff must thus be included as a part of the water diverted from Lake Michigan.

The Department estimated that the average annual runoff was about 550 cfs. However, since the decree requires that the maximum permissible diversion of 3,200 cfs be calculated on a five-year running average, the Department concluded that, in determining the amount of runoff, a maximum figure for runoff within that period (calculated as 730 cfs), rather than the annual average, should be utilized. The Department's method, of course, results in making less water available for allocation to users.

The Department's calculation of the maximum figure falls within the realm of its expertise. It is the Department which bears the responsibility for compliance with the decree, and its decision to employ the maximum rather than the average figure for runoff is not an abuse of its discretion.

The city of Highland Park charges that its allocations were discriminatory since they were based on an assessment of Highland Park's future growth in population which was less than that used for several allegedly comparable communities. Estimates of future growth depend on a variety of factual assumptions, and necessarily some divergence of opinion is to be anticipated. The possibility that a different inference might have been drawn does not compel a reviewing court to set aside the one reached by the Department.

The village of Lincolnshire requested allocations of 1.03, 1.25, 1.46, and 1.69 cfs for the years 1977, 1978, 1979, and 1980, respectively. The Department allocated no water at all to this applicant either in LMO 77–1 or LMO 77–2.

The zero allocation made by LMO 77–1 was stated in that order to be based on the Department's acceptance of population and water demand estimates for Lincolnshire made by the Northeastern Illinois Planning Commission (NIPC), Lincolnshire's own forecasts having been found inadequate.

In order LMO 77–2 the Department stated, "Upon reexamination of the evidence introduced during the proceedings, the Department has concluded that the population and water demand projections introduced by Lincolnshire are more accurate than NIPC *** and therefore Lincolnshire's estimates should be accepted. Therefore, Lincolnshire's population (including population equivalents) is projected to be 7,800 for 1980 and Lincolnshire's water demand is projected to be .668 mgd

[million gallons per day] in 1977, .810 mgd in 1978, .945 mgd in 1979, and 1.092 mgd in 1980."

Lincolnshire points out in its brief that these new figures increased its water needs very substantially. Thus, for example, the estimate originally made in LMO 77—1 for the year 1980 was only .550 mgd.

Lincolnshire contends in its brief that the Department's continued refusal to allocate any water to it was therefore not supported by the finding now made as to water requirements. In its brief the Department did not reply to this point at all, and the matter is not specifically mentioned in the opinion of the trial court. While we are not prepared to state that Lincolnshire was entitled to some allocation of water, or what the amount, if any, should be, it appears that the result reached in LMO 77—2 may represent an oversight. With respect to Lincolnshire, therefore, we consider that the judgment of the circuit court should be reversed and the cause remanded for further consideration of the allocations to be made to it.

On oral argument counsel for the appellants suggested that the Department had not allocated the entire amount of water available, and that there was thus a "surplus" which could be used to increase allocations to applicants. Upon the request of counsel for the Department, the latter was given until June 18 to file a supplemental brief responding to this claim. The Department did not file such a brief, but on July 13 sought to file an affidavit by an employee of its Lake Michigan diversion section. The village of Lincolnshire moved to strike the affidavit, on the ground that it injected new matters into the proceeding. The affidavit was not accepted for filing by the clerk of the court, and the motion of the village of Lincolnshire was accordingly not acted upon. On July 30 the Department moved for leave to file its supplemental brief instanter, a copy of which was tendered with the motion. Attached to the brief was the same affidavit referred to

above. The village of Lincolnshire again objected to the Department's motion, and that motion is hereby denied.

Order LMO 77—2 recites that the entire 3,200 cfs of water permitted to be diverted was accounted for in each of the years from 1977 through 1981. The total for each year included not only the amount allocated to applicants, but amounts for "unallocated runoff" and for "discretionary dilution." For the years 1979 and 1980, the total also included the amounts of 25.6 and 10.8 cfs, respectively, denominated as a "reserve." It appears that these amounts had been set aside for contingency purposes in order to meet possible subsequent allocations for emergencies under Rule 305.

We think that no valid question can be raised as to the propriety of the Department's setting aside a reasonable amount of water for that purpose. In any event, that issue was not raised in the appellants' briefs, nor did they challenge the amount set aside.

We conclude, therefore, that the only question properly before us concerning any failure of the Department to allocate the entire allowable amount of water relates to the Department's treatment of storm-water runoff, which has already been disposed of in this opinion.

For the reasons given, the judgment of the circuit court is affirmed in all respects except for the complaint of the village of Lincolnshire, as to which the judgment is reversed, and the cause is remanded to the circuit court with directions to proceed in a manner not inconsistent with this opinion.

*Affirmed in part and reversed in part,*
*and remanded, with directions.*